John C. **BERKERY**, Plaintiff,

v.

**CROSS COUNTRY BANK**,
et al., Defendants.

No. CIV.A. 02–2170.

United States District Court,
E.D. Pennsylvania.

April 11, 2003.

Robert F. Simone, Phila, Charles A. Gilman, Silverman & Thompson, Baltimore, MD, for John C Berkery, Plaintiff.

Martin C. Bryce, Jr., Ballard, Spahr, Andrews and Ingersoll, Phila, Eric M. Berman, Babylon, NY, Timothy P. Creech, Marion, Satzberg, Trichon, Kogan & Wertheimer, Catherine Olanich Raymond, Christie, Pabarue, Mortensen and Young, Phila, for Cross Country Bank, First National Collection Bureau, Inc., Applied Card Systems, Inc., Trans Union, LLC., Equifax, Inc., Defendants.

## MEMORANDUM

### EDUARDO C. ROBRENO, District Judge.

This is an action brought by a former credit cardholder Scott Berkery against credit card issuer Cross Country Bank ("CCB"), collection agents Applied Card Systems ("ACS") and First National Collection Bureau ("FNCB"), and two independent credit reporting agencies, Equifax and Trans Union, based on their allegedly inaccurate reporting of Berkery's credit history. Berkery seeks damages for violations of the Fair Credit Reporting Act, libel, breach of contract, intentional infliction of emotional distress, and negligent infliction of emotional distress. Before the court is defendants' motion to compel arbitration pursuant to an arbitration clause in Berkery's credit card agreement, and to stay proceedings in this court.

In this case, the court must consider two agreements: (1) the credit card agreement between Berkery and CCB, which governs the credit relationship between the parties and which contained within it an agreement to submit disputes between the parties to arbitration; and (2) a subsequent "settlement agreement" that purported to compromise the debt that Berkery allegedly owed CCB, and that allegedly terminated the Credit Card Agreement as well as the agreement to arbitrate contained therein.

CCB contends that the broadly worded arbitration clause in the Credit Card Agreement requires arbitration of any dispute between it and Berkery, regardless of whether or not the dispute arose during the life of the Credit Card Agreement. Berkery counters that the so-called settlement agreement, which contains no arbitration clause, constitutes a contract separate and distinct from the Credit Card Agreement, and, indeed, terminated the parties' obligation to arbitrate under the Credit Card Agreement. As such, according to Berkery, any dispute arising out of the settlement of Berkery's debt is not subject to arbitration.

These contentions require the court to decide two separate, but interrelated issues: (1) whether the credit reporting dispute at issue, which ostensibly arose after Berkery had terminated his account with CCB and which serves as the basis for all of his claims, nonetheless falls within the substantive and temporal scope of the arbitration clause contained in the Credit Card Agreement, and, if so, (2) whether the subsequent settlement agreement between Berkery and CCB's agent rescinded the parties' obligation to arbitrate under the arbitration clause of the Credit Card Agreement. For the reasons that follow, the court will grant the motion to compel arbitration. Pending the outcome of that arbitration, all proceedings in this case will be stayed as to CCB, and co-defendants ACS, FNCB, Trans Union and Equifax.

## I. BACKGROUND

In July 1999, John Berkery, Sr. applied for and received a VISA credit card issued by Cross Country Bank. The terms of the credit relationship between the parties are set forth in the Credit Card Agreement, issued by CCB and signed by Berkery. The Credit Card Agreement contains an

arbitration clause that provides, in relevant part, that:

> You and we agree that all claims, demands, or disputes that you may have against us or that we may have against you which in any way relate to or arise out of this Agreement, your Account, or your use or attempted use of the Card or Cash Advance Checks, or the servicing of your account by ACS or Accelerated, or this agreement to arbitrate, or the collection of what you owe on your Account, as well as involving claims of fraud or misrepresentation, or otherwise, shall be brought in arbitration before the National Arbitration Forum ("NAF").

Credit Card Agreement, at 7.

The Credit Card Agreement also contains a provision that sets forth how to accomplish termination of the account. The provision states in relevant part:

> You or we may terminate your credit privileges on your Account at any time, including when you are in Default under this Agreement. You may terminate by notifying us of your intention to terminate. If you advise us that you do not want to be responsible for, or do not want to further obligate the Deposit for, credit obtained or to be obtained by you or anyone else on your Account, we will treat that as your notice of termination. In order to terminate your credit privileges on your Account, you must (i) give us written notice of your termination of your Account, ..., (ii) cut in half and return to us any Card(s) ... which have been issued under your Account, and

> (iii) pay your outstanding New Balance in full whether such New Balance is reflected on your current Statement and/or future Statements.

Credit Agreement, at 5.

A dispute arose between Berkery and CCB over the amount owed on the account. Berkery contended that the balance owed was $242.65, whereas CCB and ACS, the agent that handled collection on CCB's credit cards, sought $648.29.[1] On or about February 22, 2000, however, Berkery cut his credit card in half, and mailed it to CCB, along with a letter, which, according to Berkery, expressed his intent to terminate his account. During the course of the next several months, Berkery continued to negotiate with CCB and its agents concerning the amount owed by Berkery to CCB on the account.

On May 10, 2001, FNCB, the external collection agency engaged by CCB to collect the $648.29 allegedly owed, sent Berkery a letter that stated:

> In order to close this account, you can by return mail send $342.65 and this account will be considered Settled in Full. Upon clearance of your payment, our client will notify the proper credit reporting agencies to reflect that your account has been paid.

> It is advised that you Federal Express your check or money order today.

> If not received by 5/18/01, consider this offer null and void.

Berkery paid FNCB the amount requested.[2]

---

1. At some point in their dispute, Berkery filed for arbitration with the National Arbitration Forum, as required under the Credit Card Agreement, but ultimately did not pursue the matter. This action by Berkery is without legal significance to the outcome of this case.

2. On July 18, 2001, FNCB sent Berkery a second letter that stated: "This is to confirm that the above named account has been settled in full to [FNCB], acting as agent for [CCB] as of 5/22/01 in the amount of $342.65. No money (regarding the above mentioned account) is due to either [CCB] or [FNCB]." Berkery has based his legal argument on the May 10, 2001 letter, and has not claimed that this second letter has any effect independent

Berkery alleges that, this letter notwithstanding, credit reporting agencies Trans Union and Equifax issued, published, and distributed credit reports reflecting that Berkery's debt remained unpaid, and was termed a "profit and loss write off" and "charge off." Berkery sued CCB, ACS, FNCB, Trans Union and Equifax in this court for violations of the Fair Credit Reporting Act, libel, breach of contract, intentional infliction of emotional distress, and negligent infliction of emotional distress. In response, defendants CCB and ACS invoked the arbitration clause contained in the Credit Card Agreement, and filed a motion to compel arbitration[3] and to stay all proceedings pending the completion of arbitration. This motion was joined by defendants FNCB and Equifax.

## III. DISCUSSION

### A. General Principles of Law

The Federal Arbitration Act (FAA) provides that "[a] written provision in any ... contract involving commerce[4] to settle by arbitration a controversy thereafter arising out of such contract or transaction ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA also provides that "[a] party aggrieved by the alleged failure, neglect, or refusal of another. to arbitrate under a written agreement for arbitration may petition any United States district court ... for an order directing that such arbitration proceed in the manner provided for in such agreement." 9 U.S.C. § 4. Pending the outcome of such arbitration, the party may also seek a stay of the proceedings before the district court. *See* 9 U.S.C. § 3. In addition to granting a stay and compelling arbitration where required by the FAA, the court in its discretion may also dismiss the action instead of staying it "[i]f all the claims involved in an action are arbitrable." *Seus v. John Nuveen & Co., Inc.,* 146 F.3d 175, 179 (3d Cir.1998); *see also Alford v. Dean Witter Reynolds, Inc.,* 975 F.2d 1161, 1164 (5th Cir.1992) (finding that 9 U.S.C. § 3 "was not intended to limit dismissal of a case under the proper circumstances"); *Sparling v. Hoffman Constr. Co., Inc.,* 864 F.2d 635, 638 (9th Cir.1988) (same).

In enacting the FAA and providing for the enforcement of arbitration

---

of the May 10, 2001 letter on the issue before the court.

**3.** Motions to compel arbitration are evaluated, in the first instance, under the well-settled summary judgment standard set forth in Fed. R.Civ.P. 56(c). *See E–Time Sys., Inc. v. Voicestream Wireless Corp.,* No. CIV. A. 01–5754, 2002 WL 1917687, at *4 (E.D.Pa. Aug. 20, 2002) (citing *Par–Knit Mills, Inc. v. Stockbridge Fabrics Co.,* 636 F.2d 51, 54 n. 9 (3d Cir.1980); *Trott v. Paciolla,* 748 F.Supp. 305, 308 (E.D.Pa.1990)). Therefore, movants must prove through "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, ... that there is no genuine issue as to any material fact and that [they are] entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The court must consider all of the non-moving party's evidence and construe all reasonable inferences in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Versarge v. Township of Clinton N.J.,* 984 F.2d 1359, 1361 (3d Cir.1993).

**4.** The Act defines "commerce," in relevant part, as "commerce among the several States ...." 9 U.S.C. § 1. In this case, Cross Country Bank is a credit card issuer with a national customer base. CCB is incorporated and has its principal place of business in Delaware, whereas plaintiff is a citizen of Pennsylvania. Neither party contests that their agreement implicates interstate commerce. Therefore, the FAA governs the arbitration provision at issue in this case.

agreements through the federal courts, Congress intended "to reverse the long-standing judicial hostility to arbitration agreements ... and to place arbitration agreements upon the same footing as other contracts." *Green Tree Fin. Corp.-Ala. v. Randolph,* 531 U.S. 79, 89, 121 S.Ct. 513, 148 L.Ed.2d 373 (2000) (quoting *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 24, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991)); *see also Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983) (noting the development in the courts of appeals of "a healthy regard for the federal policy favoring arbitration" in the wake of the passage of the FAA). To this end, "[t]he Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses Cone,* 460 U.S. at 24–25, 103 S.Ct. 927.

■ Before a federal district court entertaining a motion to compel arbitration may order a reluctant party to arbitrate, however, the FAA "requires the court to engage in a limited review to ensure that the dispute is arbitrable-i.e., that a valid agreement to arbitrate exists between the parties and that the specific dispute falls within the substantive scope of that agreement." *PaineWebber, Inc. v. Hartmann,* 921 F.2d 507, 511 (3d Cir.1990). Under this analysis, the court will first address whether the claim falls within the substantive scope of the arbitration clause contained in the Credit Card Agreement between Berkery and CCB. Second, it will

determine whether the purported settlement agreement terminated the parties' agreement to arbitrate disputes covered by the Credit Card Agreement's arbitration clause.

1. *The substantive scope of the Credit Card Agreement's arbitration clause*

■ In determining the substantive scope of an arbitration clause, the court's inquiry is limited to that of "ascertaining whether the party seeking arbitration is making a claim which on its face is governed by the contract." *Medtronic Ave, Inc. v. Advanced Cardiovascular Sys., Inc.,* 247 F.3d 44, 55 (3d Cir.2001); *see also Equinox Software Sys., Inc. v. Airgas, Inc.,* No. CIV. A. 96–3399, 1997 WL 570931, at *3 (E.D.Pa. Sept.5, 1997) (Robreno, J.) ("[T]he district court decides only whether there was an agreement to arbitrate, and if so, whether the agreement is valid .... ").

■ In making this inquiry, the court's approach is guided by a "presumption of arbitrability." *PaineWebber,* 921 F.2d at 511 (citing *AT & T Technologies v. Communications Workers of America,* 475 U.S. 643, 650, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986) and *Steelworkers v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 582–83, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960)).[5] In other words, " [a]n order to arbitrate 'should not be denied unless it may be said with *positive assurance* that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.' " *Medtronic,* 247 F.3d at 55 (quoting *Warrior & Gulf Navigation Co.,* 363 U.S. at 582–83, 80 S.Ct. 1347) (emphasis supplied).

"Positive assurance" is not, however, "absolute certainty." *PaineWebber,* 921

---

5. The interpretation and construction of arbitration agreements are determined under federal substantive law. *Harris v. Green Tree Fin. Corp.,* 183 F.3d 173, 179 (3d Cir.1999).

Under the FAA, however, state law contract defenses, federal courts may apply state law contract defenses to invalidate arbitration agreements. *Id.* (quoting 9 U.S.C. § 2).

F.2d at 512. Even as it applies the presumption of arbitrability, however, a district court must still determine, and honor, "what appears to be most consistent with the intent of the parties," *id.* at 513, on the theory that arbitration clauses are creatures of contract, and, "[a]s a matter of contract, no party can be forced to arbitrate unless that party has entered into an agreement to do so." *Id.* at 511; *see also Charles Shaid of Pa., Inc. v. George Hyman Constr.*, Civ. A. No. 92–3654, 1995 WL 46702, at *2 (E.D.Pa. Jan.31, 1995) (Robreno, J.) ("In construing a contract, a court's paramount consideration is the intent of the parties, and the strongest external sign of agreement between contracting parties is the words they use in their written contract."). Therefore, the positive assurance standard directs that "[g]enuine interpretive disputes" still be resolved in favor of arbitrability, but that "a compelling case for nonarbitrability should not be trumped by a flicker of interpretive doubt." *PaineWebber*, 921 F.2d at 513. Thus, once a court has determined that the dispute at issue falls within the substantive scope of the parties' arbitration clause, it is barred from hearing the merits of the suit, and must refer the matter to arbitration. *Id.* at 511.

▬ In this case, the Credit Card Agreement contains a broad arbitration clause that covers "*all* claims, demands, or disputes that you may have against us or that we may have against you which in any way relate to or arise out of this Agreement, your Account, your use or attempted use of the Card … or the servicing of your account by ACS or Accelerated …." Credit Card Agreement, at 7 (emphasis supplied). To escape the operation of this clause, Berkery argues that the letter that he received from FNCB on May 10, 2001, which demanded payment of $342.65 "[i]n order to close this account" constitutes a contract that is separate and distinct from the Credit Card Agreement. Based on this view of the May 10, 2001 letter, Berkery contends that the credit reporting of which he now complains breached the settlement agreement, i.e., the May 10, 2001 letter, and, therefore, lies beyond the scope of the arbitration clause in the Credit Card Agreement. In other words, Berkery maintains that he "is not alleging any breach in the [Credit Card Agreement] entered into between the parties, as the contractual relationship [established by the Credit Card Agreement] had concluded," Pl.'s Response to Def.'s Mot. to Compel Arbitration and Stay All Proceedings Pending Completion of Arbitration, at 2, but, rather, that the defendants violated the Fair Credit Reporting Act "after the original relationship had concluded by failing to report [his] 'Settled in Full' status to the proper agencies and instead maliciously supplying false and defamatory information." *Id.* For the reasons that follow, the court does not agree.[6]

First, the subject matter of Berkery's claim is, on its face, governed by the Cred-

---

6. In advancing the argument that the scope of the arbitration clause could not encompass an independent agreement, even if that agreement pertains to the same subject matter covered under the clause, plaintiff confuses the court's inquiry into the intended scope of the clause with the real issue in this case, i.e., whether a subsequent agreement modified or rescinded the clause itself. *Matterhorn, Inc. v. NCR Corp.*, 763 F.2d 866 (7th Cir.1985) is instructive as to the inquiry that is proper in this case, even though it was developed in a slightly different context. In *Matterhorn*, the challenge to the arbitrability of a particular dispute was premised on the continued "applicability" of an agreement that contained an arbitration clause. *Id.* at 871. In particular, the party opposing arbitration contended that the parties had entered into a subsequent agreement that addressed the same subject matter as, but did not incorporate, their original agreement and its arbitration clause, and

it Card Agreement, and falls within the substantive scope of the arbitration clause that is contained in the Credit Card Agreement, and that explicitly provides that the duty to arbitrate is triggered with respect to *"all ... disputes which in any way relate to or arise out of"* a CCB account or use of the CCB credit card. Credit Card Agreement, at 7 (emphasis supplied). In this case, it is undisputed that the debt at issue resulted from Berkery's use of CCB's card. Clearly then, the subject matter of the dispute at issue both is "related to" and "arises from" Berkery's account and his use of his credit card.[7]

Second, the arbitration clause contains no provision that limits the temporal reach of the clause only to those disputes that arise during the life of the Credit Card Agreement. Rather, it purports to reach all disputes "which in any way relate to or arise out of" certain enumerated aspects of the relationship between CCB and a cardholder. Thus, there is nothing in the arbitration clause that even suggests, much less states with positive assurance, that the arbitration clause is susceptible of an interpretation that disputes arising after the termination of the Credit Card Agreement are not subject to the reach of the arbitration clause. *Cf. Merrill Lynch, Pierce, Fenner & Smith v. Hovey,* 726 F.2d 1286, 1290 (8th Cir.1984) (cautioning against reading the words "arising out of" as synonymous with "during" because such an interpretation would be "inconsistent with the words chosen and the intent of the parties. The language of the agreement is broad and the term 'arising out of' contemplates that for some controversies the arbitration agreement will survive the employment relationship").[8] Therefore, unless the plaintiff can show that the arbi-

that the dispute at issue was not subject to arbitration because it arose under the second agreement, rather than the first. *Id.* In evaluating this claim, Judge Posner in lengthy dicta described the appropriate inquiry as follows:

> [T]he claim turns not on the validity of the Universal Agreement but on whether a subsequent transaction nullified the agreement. And that is as much a question about the subsequent transaction as about the Universal Agreement itself. Of course by describing the question as one of the scope of the Universal Agreement we could make it seem as if Matterhorn were really raising a question about the meaning of the Universal Agreement ... But "scope" would just be a fancy way of asking whether the Universal Agreement covered the 1980 sale, and that depends on what the parties intended when they made that sale.

*Id.* at 872. Under this logic, therefore, the proper inquiry is not whether the scope of the arbitration clause may encompass subsequent agreements between the parties, but rather whether the second agreement explicitly terminated the agreement to arbitrate. Under the *Matterhorn* formulation, the same result would obtain here.

7. Whether or not the settlement agreement was separate and distinct from the Credit Card Agreement is inapposite to this analysis. This is so because the settlement agreement addresses the same subject matter explicitly identified by the Credit Card Agreement as a trigger for arbitration. As discussed below, whether the settlement agreement is separate and independent from the Credit Card Agreement is, however, relevant to a consideration of whether a valid agreement to arbitrate was in existence at the time of the dispute at issue, or whether it had been either rescinded or superseded through subsequent actions by the parties. *See* discussion, *infra.*

8. That a broadly worded arbitration clause may reach conduct that occurs after the termination of the contract in which the arbitration clause was embedded, is a well established proposition. *See, e.g., Nolde Bros., Inc. v. Local No. 358, Bakery & Confectionery Workers Union,* 430 U.S. 243, 245, 253, 97 S.Ct. 1067, 51 L.Ed.2d 300 (1977) (noting, in the case of an agreement to arbitrate "any grievance," that "there is nothing in the arbitration clause that expressly excludes from its operation a dispute which arises under the contract, but which is based on events that

tration clause had been rescinded by the parties, the court must order arbitration in this case. *See PaineWebber, Inc. v. Hartmann,* 921 F.2d 507, 511 (3d Cir.1990).

### 2. *The existence of a valid agreement to arbitrate after rescission of the original contract containing the arbitration clause*

Plaintiff's alternative argument seems to be, although stated in oblique terms, that the May 10, 2001 letter, which Berkery has characterized as a settlement agreement, and that states that, upon payment of $342.65, his account would "be considered Settled in Full," terminated the parties' obligation to arbitrate. According to

Berkery, the *"bilateral* signing of [this] settlement . . . terminated both the [C]redit [C]ard [A]greement *and* the vaunted arbitration agreement." Pl.'s Traverse to Def.'s Mem. in Further Support of Def.'s Mot. to Compel Arbitration and Stay All Proceedings, at 3. This argument misapprehends the well settled jurisprudence that holds arbitration agreements to a life and validity separate and apart from the agreement in which they are embedded.

■ In *Prima Paint,* the Supreme Court considered whether, under the FAA, a claim of fraud in the inducement of an entire contract was to be resolved by a federal court, or referred to arbitration, pursuant to the challenged contract's arbi-

---

occur after its termination"); *see also Litton Fin. Printing Div. v. NLRB,* 501 U.S. 190, 205–06, 111 S.Ct. 2215, 115 L.Ed.2d 177 (1991) ("A postexpiration grievance can be said to arise under the contract . . . where an action taken after expiration infringes a right that accrued or vested under the agreement . . . .").

Specifically, the duty to arbitrate incidences of post-contract defamation has received extensive treatment in cases involving brokers who, as a condition to taking jobs in brokerage firms, have signed an engagement letter or other employment agreement that incorporated stock exchange rules providing for the arbitration under the FAA of any controversy "arising out of [the] employment or termination" from employment as a broker. With one exception, the courts have uniformly held that a broker aggrieved by his employer's false statements regarding "significant aspects of the employment relationship" must arbitrate that grievance, even if the employer made the statements in question after the broker had left the firm's employ and the employment agreement in which the arbitration clause was embedded had been completely terminated. *See, e.g., Fleck v. E.F. Hutton Group, Inc.,* 891 F.2d 1047, 1052 (2d Cir.1989) (compelling arbitration where "[p]roving the truth or falsity of those statements [would] require the presentation of evidence integrally related to [the employee's] performance as a broker"); *Morgan v. Smith Barney, Harris Upham & Co.,* 729 F.2d 1163,

1167 (8th Cir.1984) ("[T]he specific source from which a controversy must arise is not the employment . . . *contract;* it is simply employment . . . Consequently, the plain language . . . does not limit arbitration to contractual disputes."); *Weinstein v. Equitable Life Assurance Soc. of the United States,* No. CIV. A. 96–3614, 1996 WL 557321, at *3 (E.D.Pa. Sept.26, 1996) ("The alleged defamatory statements by defendants concerned conduct alleged to have occurred while the plaintiff was employed [by defendants] and there is no doubt that resolution of this matter will require an evaluation of [plaintiff's] performance while employed by defendants."). *But see Coudert v. Paine Webber Jackson & Curtis,* 705 F.2d 78, 81 (2d Cir.1983) (concluding that "only grievances based on conditions arising 'during the term of the agreement to arbitrate' are arbitrable after the term has ended."). The brokerage cases provide a useful analogue for the present case on the issue of the scope of the arbitration clause. Here, the ultimate determination of whether the defendants in this case defamed Berkery by inaccurately reporting his credit history will require an evaluation of his performance and payment activity while he was still a customer of CCB, even if the actual reporting and defamation occurred after the termination of the contract. Accordingly, the defamation of which Berkery complains arises out of his account and his performance in relation to that account and therefore falls within the purview of the arbitration clause.

tration clause. *Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 402, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967). The Supreme Court concluded that

> [I]f the claim is fraud in the inducement of the arbitration clause itself-an issue which goes to the "making" of the agreement to arbitrate-the federal court may proceed to adjudicate it. But the statutory language does not permit the federal court to consider claims of fraud in the inducement of the contract generally.

*Id.* at 403–04, 87 S.Ct. 1801. Thus, "[t]he teaching of *Prima Paint* is that a federal court must not remove from the arbitrator[ ] consideration of a substantive challenge to a contract unless there has been an *independent challenge* to the making of the arbitration clause itself." *Large v. Conseco Fin. Servicing Corp.,* 292 F.3d 49, 53 (1st Cir.2002) (quoting *Unionmutual Stock Life Ins. Co. of America v. Beneficial Life Ins. Co.,* 774 F.2d 524, 529 (1st Cir.1985)) (emphasis supplied).

Given this background, therefore, the Supreme Court has stated that "where [a] dispute is over a provision of [an] expired agreement, the presumptions favoring arbitrability must be negated expressly or by clear implication." *Nolde Bros., Inc. v. Local No. 358, Bakery & Confectionery Workers Union,* 430 U.S. 243, 255, 97 S.Ct. 1067, 51 L.Ed.2d 300 (1977); *accord Riley Mfg. Co., Inc. v. Anchor Glass Container Corp.,* 157 F.3d 775, 781 (10th Cir.1998) ("[A]n arbitration provision in a contract is presumed to survive the expiration of that contract unless there is some express or implied evidence that the parties intend to override this presumption."). The same is true whether the original agreement is rescinded, as opposed to merely expired, *Emcasco Ins. Co. v. Nasuti,* Civ. No. 90–3424, 1992 WL 19858, at *3 (E.D.Pa. Jan.30, 1992), *aff'd* 975 F.2d 1549 (3d Cir. 1992) ("[A]rbitration clauses are generally treated as separable and are not rescinded by attempted rescission of the entire contract."); *Pa. Data Entry, Inc. v. Nixdorf Computer Corp.,* 762 F.Supp. 96, 99 (E.D.Pa.1990) (gathering cases and explaining that district and circuit courts "universally hold that a claim for rescission of an agreement containing an arbitration clause does *not* defeat arbitrability."), or the subject of a settlement agreement. *See Continental Ins. Co. v. Allianz Ins. Co.,* No. 02–7438, 2002 WL 31819599, at *2 (2d Cir. Dec.16, 2002) (finding that the arbitration clause contained in the original agreement "remained valid and enforceable at all pertinent times. This is true even if … the [settlement agreement] cancelled the [original] Agreement because we find no express rescission of the arbitration provision. Absent an explicit intent to rescind, … the arbitration clause survived …  .").

▉▉▉▉▉ In this case, there is no evidence that either the May 10, 2001 letter nor any other agreement expressly or by clear implication rescinded the arbitration clause contained in the Credit Card Agreement.[9] First, the May 10, 2001 letter makes no mention of the arbitration clause contained in the Credit Card Agreement, much less does it purport to be an express

---

**9.** Berkery's conduct in informing CCB of his intention to terminate his account, cutting up his credit card, and returning it to CCB, and paying the balance demanded in the May 10, 2001 letter could not constitute express rescission of the arbitration clause. According to the Credit Card Agreement, these acts are necessary for a cardholder to terminate the "credit privileges on [the] Account." *See* Credit Card Agreement, at 5. Thus, under the Credit Card Agreement the actions taken by Berkery are not directed at terminating the arbitration clause in particular. In any event, one party may not "extinguish the right of the other to proceed with arbitration of its claim by a unilateral termination of the contract." *Pa. Data Entry, Inc. v. Nixdorf Computer Corp.,* 762 F.Supp. 96, 99 (E.D.Pa.1990).

rescission of that clause. Second, the May 10 letter, on its face, purports to modify only one specific aspect of the relationship between the parties, i.e., the balance that Berkery owed CCB, and nothing more.[10] In this context, the teachings of *Prima Paint, Nolde Bros.*, and their progeny, compel the court to find that the Credit Card Agreement's arbitration clause survived the purported settlement agreement that addressed Berkery's debt, and that at the time that the alleged defamation took place, there was a valid arbitration clause in existence between the parties. Thus, arbitration of this dispute must be compelled under the Credit Card Agreement's arbitration clause.

### B. Effect of Compelling Arbitration Between Berkery and CCB

▮ The court having compelled arbitration of Berkery's claim against CCB, it must now determine whether to stay or dismiss Berkery's claims against CCB as well as the claims against the other parties to this litigation. In *Seus v. John Nuveen & Co., Inc.*, 146 F.3d 175 (3d Cir.1998), the Third Circuit concluded that the district court had discretion to determine whether to dismiss or stay proceedings once arbitration was compelled. *See id.* at 179. In this case, given that plaintiff's claims against the other defendants all relate to the relationship between Berkery and CCB and will be impacted by the outcome of the arbitration between Berkery and CCB, the court will stay both the claims against CCB, and those against ACS, FNCB, Trans Union and Equifax pending the outcome of the arbitration.[11]

### III.  CONCLUSION

For the foregoing reasons, the court will compel arbitration of Berkery's claim

---

**10.** Plaintiff relies on *Battaglia v. McKendry,* 233 F.3d 720 (3d Cir.2000). *Battaglia* involved a settlement agreement and a consulting agreement that were executed by related parties either contemporaneously or close in time, settling ongoing litigation. *Id.* at 722–23. The settlement agreement contained an arbitration clause, but the consulting agreement did not. *Id.* at 723. The plaintiff in *Battaglia* brought an action in the district court and sought to enjoin the arbitration of a dispute arising from the consulting agreement. *Id.* at 724. The district court entered summary judgment for the party urging arbitration. *Id.* The Third Circuit reversed, finding that there was a genuine issue of material fact as to whether the two agreements were sufficiently related for the arbitration clause of the settlement agreement to reach disputes under the consulting agreement. *Id.* at 729.

*Battaglia* teaches that when the evidence is "inconclusive," *id.* at 729, or subject to more than one interpretation, the issue of whether two agreements are related, or separate and independent of one another, such that the arbitration clause in one would reach disputes under the other, precludes the entry of summary judgment. In this case, however, the evidence (the May 10, 2001 letter), viewed in the light most favorable to plaintiff, is sub-

ject only to the interpretation that it was not intended to rescind, "expressly or by clear implication," *Nolde Bros., Inc. v. Local No. 358, Bakery & Confectionery Workers Union,* 430 U.S. 243, 255, 97 S.Ct. 1067, 51 L.Ed.2d 300 (1977), the arbitration clause embedded in the Credit Card Agreement. *See supra* p. 18–20. Under these facts, *Battaglia* is not helpful to plaintiff.

**11.** The Supreme Court has noted that Federal Arbitration Act "*requires* piecemeal litigation when necessary to give effect to an arbitration agreement." *Moses H. Cone Mem. Hosp. v. Mercury Constr. Co.,* 460 U.S. 1, 20, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). Noting that in some cases it is "advisable to stay litigation among the non-arbitrating parties pending the outcome of the arbitration," *id.* at 20 n. 23, 103 S.Ct. 927, the Supreme Court has emphasized that the decision to stay proceedings against parties is a matter within the district court's "discretion to control its docket." *Id.* The Third Circuit has found decisions to stay arbitration proper in circumstances where non-parties to an arbitration agreement "have related and congruent interests with [those of the parties who were also] principals to the litigation." *Barrowclough v. Kidder, Peabody & Co.,* 752 F.2d 923, 938 (3d

against CCB, and will dismiss Berkery's action against CCB in this court. Litigation against ACS, FNCB, Trans Union and Equifax will be stayed pending the outcome of the arbitration between Berkery and CCB.

An appropriate order follows.

## ORDER

**AND NOW**, this 11th day of **April, 2003**, it is hereby **ORDERED** as follows:

1. Defendants Cross Country Bank and Applied Card Systems, Inc.'s Motion to Compel Arbitration (doc. no. 3–1) is **GRANTED**.[1]

2. Defendants Cross Country Bank and Applied Card Systems, Inc.'s Motion to Stay All Proceedings Pending Completion of Arbitration (doc. no. 3–2) is **GRANTED**.

3. All proceedings against all defendants are **STAYED** until further order of the court.

Cir.1985), *overruled on other grounds, Pritzker v. Merrill Lynch, Pierce, Fenner & Smith*, 7 F.3d 1110 (3d Cir.1993). In light of these teachings, the court concludes that staying proceedings against ACS, FNCB, Trans Union and Equifax pending the outcome of Berkery's arbitration with CCB is appropriate in this case. Indeed, Berkery himself contends that the claims against all five defendants in this action are "inextricably intertwined."

As noted above, ACS appears to handle marketing and internal collection services for CCB, and the "servicing of [an] account by ACS" is explicitly mentioned in the Credit Card Agreement as one occurrence that triggers the duty of a cardholder to arbitrate. It is likely, but not explicitly argued, that ACS serviced Berkery's account in particular as an agent of CCB. FNCB, on the other hand, clearly serviced Berkery's account, as it is the external collection agency that drafted the May 10, 2001 letter characterized as a settlement agreement. Because ACS' and FNCB's

**IT IS FURTHER ORDERED** that the case shall be placed in the suspense docket until further order of the court.

**AND IT IS SO ORDERED.**

liability in such a case would depend on a determination by the arbitrator as to whether CCB, the signatory of the arbitration agreement, correctly reported Berkery's credit, staying proceedings pending a resolution of Berkery's claims against CCB through arbitration is proper.

Similarly, it is abundantly clear that the viability of Berkery's claims against Trans Union and Equifax also depends on the outcome of his arbitration with CCB. For example, Berkery's case against Trans Union and Equifax could be mooted if the arbitrator were to find that the credit report that CCB issued to these two outside agencies was accurate. Therefore, a stay of proceedings is appropriate with respect to these two defendants as well.

1. Upon completion of arbitration proceedings, the prevailing party shall bring the results of the arbitration to the attention of the court so that an appropriate may be entered.