United States Court of Appeals,

Fifth Circuit.

No. 91–4804.

Bobby HARRIS, et al., Plaintiffs–Appellants,

v.

BLACK CLAWSON COMPANY, et al., Defendants, Intervenors–Defendants–Appellees,

Riverwood International Corp., formerly known as Manville Forest Products Corp., Defendant, Intervenor–Plaintiff–Appellant.

May 29, 1992.

Appeals from the United States District Court for the Western District of Louisiana.

Before SMITH and EMILIO M. GARZA, Circuit Judges, and KENT,[*] District Judge.

SAMUEL B. KENT, District Judge.

I.

This case arises out of an industrial accident that occurred on October 20, 1987, at the West Monroe, Louisiana plant of the Manville Forest Products Corporation ("MFPC"). The accident occurred when steam was injected into a concrete hydrapulper.[1] At that time, Bobby Harris, Travis Ellard, and Robert Sanderson were wo rking inside the hydrapulper as part of a maintenance team replacing internal parts. Ellard and Sanderson were killed and Harris was severely burned.

Plaintiffs below filed suit against several defendants in Louisiana state court on September 23, 1988. Defendants removed to federal court on October 31, 1988. Of those defendants originally sued, only Black Clawson Company remains; the rest were dismissed by the district court on its own

[*]District Judge of the Southern District of Texas, sitting by designation.

[1]A hydrapulper is a large machine used in the paper manufacturing process. As paper is pressed through a roller, excess pieces fall off and are channelled into a hydrapulper. The hydrapulper grinds up these pieces, sometimes with the aid of water or steam. After the excess material is ground up, it is sent back to the "wet end" of the paper machine.

motion.[2]

Subsequently, Plaintiffs were given leave to add Ford, Bacon & Davis ("FB & D") and Ford, Bacon & Davis Construction Company ("FB & DCC") as defendants. Thereafter, Plaintiffs filed two Motions to Remand, both based on the ground that FB & D or FB & DCC or both were citizens of Louisiana and that, therefore, complete diversity was lacking. These motions were denied. Additionally, Plaintiffs filed Motions for Reconsideration, Second Motions for Reconsideration, and Motions for Leave to Appeal, all of which were denied. Finally, Plaintiffs twice petitioned this court for a writ of mandamus; both petitions were denied.

All of the Defendants moved for summary judgment. These motions were granted on the ground that all of Plaintiffs' claims are barred by the Louisiana statute of repose. This appeal followed.

## II.

It is undisputed that all of the Plaintiffs below are citizens of Louisiana. Appellants argue that FB & DCC is also a citizen of Louisiana, and that, therefore, complete diversity does not exist between the parties.[3]

A corporation is a citizen of both its state of incorporation and the state in which it has its principal place of business. 28 U.S.C. § 1332. FB & DCC was incorporated in New York. This circuit applies the "total activity" test to determine a corporation's principal place of business for diversity purposes. *J.A. Olson Co. v. City of Winona,* 818 F.2d 401, 406 (5th Cir.1987). This test

[2]Appellant MFPC was not a plaintiff in the district court. After being dismissed as a party defendant, it intervened to protect its interest in the amounts it has paid in workers' compensation claims. It joins Plaintiffs below in this appeal.

[3]Plaintiffs below also argued in the district court that FB & D is a citizen of Louisiana. This claim was not, however, briefed or argued before us, and we therefore consider it abandoned. *Villanueva v. CNA Ins. Cos.,* 868 F.2d 684, 687 n. 5 (5th Cir.1989).

includes both of the traditional tests for determining principal place of business: the "nerve center" test and the "place of activities" test.[4] Under the "total activity" test, the court considers

> the general rules of the two tests in light of the particular circumstances of a corporation's organization [and] balance[s] the facts [of the particular case before it] to determine ... the location of the corporation's principal place of business.[5]

Whether diversity jurisdiction exists is determined by examining the citizenship of the parties at the time suit was filed. *Smith v. Sperling,* 354 U.S. 91, 93 n. 1, 77 S.Ct. 1112, 1113 n. 1, 1 L.Ed.2d 1205 (1957). In the instant case, FB & DCC was inactive at the time suit was filed and had been so for over five years. Thus, at that time, FB & DCC's total activities in Louisiana were zero: it had no business office, no employees or service personnel, and no other ongoing business activities.

The issue of the location of an inactive corporation's principal place of business is one of first impression in this circuit. Appellants argue that despite FB & DCC's inactive status, its representations in annual reports and other documents filed with the Louisiana Secretary of State that its principal place of business was in Louisiana establish that Louisiana is FB & DCC's principal place of business. Appellants, however, cite no authority to support this proposition. Indeed, at least a few district courts have held that statements made to the secretary of state of a particular state are *not* binding for purposes of determining subject matter jurisdiction. *Gautreau v. Central Gulf S.S.,* 255 F.Supp. 615 (E.D.La.1966); *Overton v. Rainbo Baking Co.,* 239 F.Supp. 800, 801 (E.D.Tenn.1965). Also, it has been held that statements made to the Securities and Exchange Commission are likewise not binding. *Uniroyal, Inc. v. Heller,* 65 F.R.D. 83 (D.C.N.Y.1974). Similarly, even though the

---

[4]The "nerve center" test is derived from the decision in *Scot Typewriter Co. v. Underwood Corp.,* 170 F.Supp. 862 (S.D.N.Y.1959). Under this test, a corporation's principal place of business is the place where the corporation's business is ultimately directed and controlled. The "place of activities" test is derived from the decision in *Kelly v. United States Steel Corp.,* 284 F.2d 850 (3d Cir.1960). Under this test, a corporation's principal place of business is the center of its production or service activities. *See* 13B C. Wright, A. Miller & E. Cooper, Federal Practice & Procedure, § 3625, at 621 (2d ed. 1984).

[5]*Olson,* 818 F.2d at 412. *See also* 13 B C. Wright, A. Miller & E. Cooper, supra, § 3625, at 625 (arguing that *Scot* and *Kelly* "simply can be viewed as particular applications of the general rule that the bulk of corporate activity ... governs the choice of principal place of business.").

Internal Revenue Service requires that a corporate return be filed where the corporation has its principal place of business, the fact that a return was filed in a particular state in compliance with this requirement is not determinative for subject matter jurisdiction purposes. C. Wright, A. Miller & E. Cooper, *supra,* § 3625, at 639.

By contrast, Appellees argue that because FB & DCC is an inactive corporation,[6] it has no principal place of business and is a citizen only of its state of incorporation, New York. Thus, it is diverse from each of the Plaintiffs, all of whom are citizens of Louisiana.

This conclusion is consistent with the decisions of several district courts. For example, in *Gavin v. Read Corp.,*[7] the district court held that where, as of the date suit was filed, the defendant corporation had no office, did not pay rent on any office, and had no employees, office equipment, or furniture, it was a citizen only of its state of incorporation, Delaware, notwithstanding that it maintained an agent for service of process in another state.

Similarly, in *Kreger v. Ryan Bros., Inc.,*[8] suit was filed in Pennsylvania in 1966. The defendant had been engaged in business in Pennsylvania until 1963. Subsequently, however, it had conducted only insubstantial activities in the state and had become almost entirely inactive. The court held that while Pennsylvania might well have been its principal place of business prior to 1963, "[f]ollowing the general inactivity of the defendant in 1963, defendant's incorporation in Wisconsin and other indicia of its life there acquired new prominence as factors determining its principal place of business." 308 F.Supp. at 728. Thus, the court concluded, the defendant's principal place of business was in its state of incorporation.

---

[6]FB & DCC has been inactive for more than five years.

[7]356 F.Supp. 483, 486–87 (E.D.Pa.1973).

[8]308 F.Supp. 727 (W.D.Pa.1970).

There also exists, however, a small line of cases holding that the principal place of business of an inactive corporation is the place of its last business activity. This rule is apparently derived from the bankruptcy rule that venue for bankruptcy proceedings is properly laid in the jurisdiction in which a corporation conducted its last business activity. 28 U.S.C. § 1408. For example, in *WM. Passalacqua Builders, Inc. v. Resnick Developers S., Inc.,*[9] the Second Circuit held that an inactive corporation's citizenship is determined by both its state of incorporation and the place of its last business activity.

> Both the state of incorporation and the principal place of business should be considered in deciding whether diversity jurisdiction is present. To allow inactive corporations to avoid inquiry into where they were last active would give them a benefit Congress never planned for them, since under such a rule a defunct corporation, no matter how local in character, could remove a case to federal court based on its state of incorporation.

*Id.* at 141. *See also Comtec, Inc. v. National Technical Sch.,* 711 F.Supp. 522, 524–25 (D.Ariz.1989).

In both *WM. Passalacqua* and *Comtec,* however, there was substantial evidence that the corporation's last business activity took place in the state that was its last principal place of business. *WM. Passalacqua,* 933 F.2d at 141; *Comtec,* 711 F.Supp. at 525. Thus, although the *WM. Passalacqua* and *Comtec* courts did not purport to apply the "total activity" test, we believe that, based on the particular facts of each case, the same result would have been reached in each case had the "total activity" test been applied.

To adopt a rule that the place of an inactive corporation's last business active is *relevant* to determining its citizenship for subject matter jurisdiction purposes, especially where that activity took place in its last principal place of business is perfectly consistent with the "total activity" test. A rule that the place of an inactive corporation's last active is *always determinative* of its citizenship for diversity purposes, however, has the potential to produce the odd result that an inactive corporation

---

[9]933 F.2d 131 (2d Cir.1991).

may be held to have its principal place of business in a jurisdiction in which it would never have been held to have its principal place of business while it was active. Surely Congress cannot have intended to produce this result either. Thus, a wholesale adoption of the "last activity test" would appear to be at odds with the "total activity" test. Therefore, we hold that, while the place of an inactive corporation's last business activity is relevant to determine its principal place of business, it is not dispositive.

In the instant case, however, we do not reach the question of the weight to be given to the place of FB & DCC's last business activity. Instead, we hold that, as a matter of law, where a corporation has been inactive in a state for a substantial period of time,[10] in this case five years, that state is not the corporation's principal place of business, irrespective of any representations the corporation may have made to state officials.[11] Because FB & DCC was inactive in Louisiana for a substantial period of time prior to the filing of this suit, its principal place of business at the time suit was filed was not in Louisiana.[12] Therefore, complete diversity exists between the parties, and the district court properly exercised subject matter jurisdiction.

## III.

The Louisiana Statute of Repose, La.Rev.Stat.Ann. § 9:2772, precludes any suit based on the allegedly defective design or construction of an immovable from being brought more than ten years after the completion of the work performed. *Carr v. Mississippi Valley Elec. Co.,* 285 So.2d 301

---

[10]The question of substantiality must be decided on a case-by-case basis.

[11]We do not hold, however, that a corporation's representations to state officials are never relevant to the determination of the corporation's principal place of business.

[12]Ruling as we do, it is unnecessary for us to consider whether a corporation must have a principal place of business pursuant to 28 U.S.C. § 1332. Also, assuming that FB & DCC has a principal place of business, it is unnecessary for us to determine where it is. Because Plaintiffs below are all citizens of Louisiana, it is sufficient for us to determine that FB & DCC's principal place of business is not in Louisiana. Finally, it is unnecessary for us to consider the argument that FB & DCC should be dismissed under the rule of *Newman–Green, Inc. v. Alfonzo–Larrain,* 490 U.S. 826, 109 S.Ct. 2218, 104 L.Ed.2d 893 (1989), and the claim that FB & D and FB & DCC were fraudulently joined.

(La.Ct.App.1973). The peremptive[13] period runs from the date of registry of acceptance by the owner in the mortgage records or from six months after occupancy by the owner. For actions against the design professional, the period may also run from the completion of the design, if no inspection services are performed by the designer. La.Rev.Stat.Ann. § 9:2772(A)(1)–(3). The district court held that all of Plaintiffs' claims were precluded by this statute.

A.

In the instant case, the record indicates that Black Clawson designed the hydrapulper, and that FB & DCC participated in the construction at least to the extent of making it "site specific." Appellants, however, argue that the statute does not apply because the hydrapulper tub is not an immovable. Appellants point out that in several documents, including numerous appraisals and mortgages, MFPC has characterized the hydrapulper tub as a movable. In particular, Appellants rely on the Cancellation of Declaration of Immobilization of Machinery and Appliances by Manville Forest Products Corporation, which is dated October 13, 1987. This document declares that all of MFPC's machinery, appliances, devices, fixtures, and the like are movables as of August 1, 1929.

Under Louisiana law, however, the peremption period cannot be "renounced, interrupted, or suspended,"[14] and the running of the peremption period destroys a cause of action, and it cannot be revived by subsequent acts. Thus, Defendants argue that, assuming that the hydrapulper was an immovable when it was designed, the peremption period began to run in 1975 at the latest, and that no subsequent statements to the contrary can be held to have tolled the statute. Similarly, once the statute had run (by 1985), Plaintiffs' causes of action were destroyed,[15] and no statements by MFPC, such as the 1987 Declaration, could revive those causes of action.

[13]The statute uses "peremptive" rather than "preemptive."

[14]La.Civ.Code Ann. art. 3461.

[15]The running of the statute of repose "totally destroys the previously existing" cause of action. *Bunge Corp. v. GATX Corp.,* 557 So.2d 1376, 1379 (La.1990) (quoting *Pounds v. Schori,* 377 So.2d 1195, 1198 (La.1979)).

Appellants cite no authority for the proposition that MFPC's statements are determinative as to whether the hydrapulper is an immovable, and indeed, it would be odd to conclude that, if the hydrapulper is an immovable under Louisiana law, MFPC's statements could convert it into a movable.[16] *See KSLA–TV, Inc. v. Radio Corp. of Am.,* 501 F.Supp. 891, 895 (W.D.La.1980) ("the fact that the parties in this cases treated [the object allegedly subject to the statute of repose] as a movable for [purposes of a chattel mortgage] is not controlling"), *aff'd,* 693 F.2d 544 (5th Cir.1982).

Under Louisiana law, only tracts of land and their component parts are immovables. La.Civ.Code art. 462. To be a considered a component part of a tract of land, a piece of equipment, such as the hydrapulper tub, must be permanently attached to the land and must belong to the owner of the land. *Lopez v. Chicago Bridge & Iron Co.,* 546 So.2d 291, 298 (La.Ct.App.), *writ denied,* 551 So.2d 1323 (La.1989). In the instant case, the latter issue is undisputed; the former, however, irrespective of the prior statements of MFPC, is a closer question. On balance, however, Defendants' arguments are more persuasive.

A piece of equipment is permanently attached if it "cannot be removed without substantial damage to [itself] or to the immovables to which [it] is attached." La.Civ.Code art. 466. Appellants argue that, for the most part, equipment and machinery are movables; buildings, constructions, and land are immovables, and that under this definition the hydrapulper tub is a movable. Appellants rely on *Rochon v. Dresser Indus., Inc.,*[17] in which the plaintiff sued for injuries he received when a generator unit on an offshore oil platform exploded as he was attempting to start it. The court denied

---

[16]Plaintiffs appear to be asserting some sort of estoppel doctrine: because Defendants have previously claimed that the hydrapulper is a movable, they cannot now claim that it is an immovable. However, "[e]stoppels should be resorted to solely as a means of preventing injustice and should not be permitted ... to extend beyond the requirements of the transactions in which they originate." 28 Am.Jur.2d *Estoppel and Waiver* § 3, at 601 (1966). In the instant case, there does not appear to be any evidence that Plaintiffs relied on the statements that the hydrapulper tub was a movable or that Defendants gained any particular advantage from such statements such that it would be unfair not to hold Defendants to them for purposes of this litigation.

[17]No. 89–4648, 1991 WL 65566 (E.D.La.1991).

the defendants' motion for summary judgment on the ground that it had not been demonstrated that the plaintiff's claims were barred by the statute of repose. The court acknowledged that an oil platform is an immovable. However, the plaintiff's complaint alleged that his injuries were caused, not by a defect in the platform, but by a defect in the generator. Since the defendants had introduced no evidence to show that the generator was permanently attached to the land, the court denied the motion.[18]

By contrast, in the instant case, the evidence indicates that the hydrapulper tub is a reinforced concrete tub with dimensions of approximately twelve by eighteen feet. Moreover, it is permanently embedded in the ground and cannot be removed without damaging either the tub or the building to which it is attached. Therefore, the tub is distinguishable from the generator in *Rochon*.

Additionally, in *KSLA–TV v. Radio Corp. of Am., supra,* the court held that a contract for the design and construction of a 1,709′ 70 antenna was a construction contract and not a sales contract. Therefore, the antenna was an immovable and the statute of repose applied. 501 F.Supp. at 895. In reaching this conclusion, the court noted that in determining whether a contract is a construction contract or a sales contract, Louisiana courts "generally ... "weigh[ ] the economics of the situation' to determine whether the primary obligation is one "to give' [sales contract] or "to do' [construction contract]." *Id.* at 894 (quoting *The Work of the Louisiana Appellate Courts for the 1977–1978 Term—Sales,* 39 La.L.Rev. 705, 712 (1979)). The court distinguished the contract for the purchase and installation of the antenna from purchase and installation contracts concerning smaller, more standardized products which can be constructed elsewhere and installed later, such as air conditioners, glass windows and doors, awnings, and the like. In the latter contracts, the installation provisions are only an incidental part of the agreement. The value of the obligation to install the

---

[18]In the other case relied on by Plaintiffs, *Lopez v. Chicago Bridge & Iron Co., supra,* the court held that an autoclave was not an immovable because there was no evidence that the owner of the autoclave owned the land it was attached to. 546 So.2d at 298–99. By contrast, in the instant case, there is no dispute that MFPC owned both the hydrapulper and the land it was attached to.

equipment is minimal compared to the value of the equipment itself. *Id.* at 894. By contrast, it could not be said that the provision providing for the installation of the antenna was incidental to the contract. *Id.* at 895.

In the instant case, it is difficult to characterize the contracts in the record as either construction contracts or installation contracts. However, it is certain that the tub was constructed on site, and it is simply not possible that such a large structure could be constructed elsewhere and shipped to the site for installation. Moreover, given the size of the tub and the fact that it is embedded in the building in which it is installed, it cannot be said that the installation provision of the contract for the design and installation of the tub was merely incidental to the tub's sale.

B.

Appellants also argue that Defendants failed to present any summary judgment evidence as to the date of the acceptance of the contract to design and install the hydrapulper. Therefore, a genuine issue of material fact exists as to whether the peremptive period has run. In particular, Appellants point to the Acceptance of Construction for Contract # MRC 172, which was submitted to the district court. Page 31 of this contract lists specified drawings to which this contract applies. These drawings are identified by drawing numbers. None of the drawings issued by Black Clawson for the hydrapulper contain any of these numbers. Therefore, Defendants have failed to establish the acceptance of contract necessary to start the peremptive period running.

All of this, however, is irrelevant. The contract registered in 1971 is indisputably the tiling contract for the tub. The peremptive period begins to run on the date of registry of acceptance by the owner in the mortgage record. La.Rev.Stat.Ann. § 9:2772(A)(1). Therefore, the peremptive period began to run when the tiling contract was accepted.

Moreover, acceptance is only one way to start the running of the peremptive period. It is

undisputed that the tub was in use in 1975. Therefore, the owner necessarily took possession of the tub no later than that time. If the statute had not already started running, it began to run at that time. *Id.* § 9:2772(A)(2). *See also Guidry v. Sunset Recreation Club, Inc.,* 571 So.2d 870, 872–73 (La.Ct.App.1990), *writ denied,* 577 So.2d 14 (La.1991). Similarly, the completion of the design of a product is also sufficient to start the running of the peremptive period, if the designer does not perform any subsequent inspection services. La.Rev.Stat.Ann. § 9:2772(A)(3). The tub was necessarily designed by 1975 and Black Clawson performed no subsequent inspection services. Therefore, the peremptive period began running, at the very latest, in 1975.

## C.

Plaintiffs also assert that the statute of repose does not apply to products liability actions. This is incorrect. It is true, however, that in *Bunge Corp. v. GATX Corp.,*[19] the Louisiana Supreme Court created a limited exception, for certain failure to warn cases, to the general rule that the statute does apply to products liability cases.[20] *Bunge* concerned a contractor who constructed a grain storage tank, and who subsequent ly learned that the tank was defective, but failed to inform the owner. Under t hese circumstances the court held that the contractor's failure to warn could fall within the fraud exception to the statute of repose. In the instant case, however, the record contains no evidence that Defendants ever knew that the tub was defectively designed. Therefore, *Bunge* is not applicable: there is no genuine issue of material fact as to whether their failure to warn should fall under the statute's fraud exception.[21]

---

[19]557 So.2d 1376 (La.1990).

[20]In support of the proposition that the statute does not apply in any products liability cases, Defendants cite only several California cases involving the California statute of repose. Each case involves a standardized product which was shipped to the consumer after being built at the factory. The customer then installed it himself or paid a third party to install it. *See Baker v. Walker & Walker, Inc.,* 133 Cal.App.3d 746, 184 Cal.Rptr. 245 (Ct.App.1982); *Nichols v. Swimquip,* 171 Cal.App.3d 216, 217 Cal.Rptr. 272, 275 (Ct.App.1985).

[21]After *Bunge* was decided, the Louisiana legislature specifically amended the statute to make it applicable to failure to warn cases. *See* La.Rev.Stat.Ann. § 9:2772(B)(5). Appellees argue that this amendment should be applied retroactively. Holding as we do, it is unnecessary for us to consider this contention.

D.

Finally, Appellants argue that the Louisiana statute of repose is unconstitutional under both the United States and the Louisiana Constitutions. In the majority of cases relied on by Appellants, however, a st atute of repose was held unconstitutional because it could not be squared with a particular provision of a *state* constitution.[22] In the instant case, however, the Louisiana Supreme Court has upheld the constitutionality of section 9:2772 under the Louisiana Constitution. *Burmaster v. Gravity Drainage Dist. No. 2,* 366 So.2d 1381, 1384–88 (La.1978). Moreover, while some state courts have held that statutes of repose similar to the one at issue in this case violate the Equal Protection and Due Process clauses of both the federal and their respective state constitutions,[23] we are not convinced that section 9:2772 is not rationally related to a legitimate state objective. *See Burmaster,* 366 So.2d at 1386–87.

IV.

Therefore, we conclude that the district court correctly held that all of Plaintiffs' causes of action are preempted by the Louisiana statute of repose. It is thus unnecessary for us to consider whether a genuine issue of material fact exists regarding any of Plaintiffs' substantive allegations.

AFFIRMED.

---

[22]*See Jackson v. Mannesman Demag Corp.,* 435 So.2d 725, 727–29 (Ala.1983); *Skinner v. Anderson,* 38 Ill.2d 455, 231 N.E.2d 588 (1967); *Perkins v. Northeastern Log Homes,* 808 S.W.2d 809, 811–18 (Ky.1991); *McCollum v. Sisters of Charity of Nazareth Health Corp.,* 799 S.W.2d 15, 17 (Ky.1990); *Tabler v. Wallace,* 704 S.W.2d 179, 183 (Ky.1983); *Hanson v. Williams County,* 389 N.W.2d 319, 328 (N.D.1986); *Reynolds v. Porter,* 760 P.2d 816, 819–25 (Okla.1988); *Daugaard v. Baltic Coop. Bld. Supply,* 349 N.W.2d 419, 424–27 (S.D.1984); *Klatt v. Thomas,* 788 P.2d 510, 511 (Utah 1990); *Wrolstad v. Industrial Comm'n,* 786 P.2d 243, 245 (Utah 1990); *Horton v. Goldminer's Daughter,* 785 P.2d 1087, 1088–94 (Utah 1989); *Philips v. ABC Builders, Inc.,* 611 P.2d 821, 831 (Wy.1980).

[23]*See Fujioka v. Kam,* 514 P.2d 568, 570–72 (Haw.1973); *Henderson Clay Prod., Inc. v. Edgar Wood & Assoc.,* 122 N.H. 800, 451 A.2d 174 (1982); *Loyal Order of Moose Lodge 1785 v. Caveness,* 563 P.2d 143, 147–48 (Okla.1977); *Funk v. Wollin Silo & Equip.,* 435 N.W.2d 244, 248–52 (Wis.1989); *Kallas Millwork Corp. v. Square D Co.,* 66 Wis.2d 382, 225 N.W.2d 454, 458–60 (1975).