**HOMESTAKE LEAD COMPANY OF MISSOURI, Plaintiff,**

v.

**DOE RUN RESOURCES CORPORATION, and Does 1–10, Defendants.**

**No. C 03–0326 MHP.**

United States District Court, N.D. California.

Sept. 15, 2003.

---

James Thompson Hendrick, William Curtis Rogers, Thelen Reid & Priest LLP, San Francisco, CA, for Plaintiff.

Andrew Rothschild, Lewis, Rice & Fingersh, L.C., St. Louis, MO, David Eiseman, Jennifer A. Kash, Quinn Emanuel Orquhart Oliver & Hedges, San Francisco, CA, for Defendants.

*MEMORANDUM AND ORDER RE MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS*

PATEL, Chief Judge.

Plaintiff Homestake Lead Company ("Homestake") brings this action against defendant Doe Run Resources Corporation ("Resources") seeking declaratory relief with respect to Resources' duty to defend and indemnify Homestake in a series of tort cases. Homestake alleges an obligation on the part of Resources to reimburse outstanding legal expenses and costs, to defend Homestake in ongoing cases, to indemnify Homestake against judgments, settlements, and other adverse payments that may occur in such cases, and to pay Homestake's costs, expenses and attorneys' fees. Now before the court is Resources' motion to compel arbitration and stay proceedings. Before considering the arguments and submissions, however, this court raised *sua sponte* a jurisdictional question as to whether there was complete diversity among the parties. Now, having considered parties' responsive papers on the jurisdictional question, as well as all submissions concerning the motion to compel arbitration, and for the reasons set forth below, the court rules as follows.

*BACKGROUND*[1]

On November 1, 1986, Homestake and Resources, then known as St. Joe's Mineral Corporation, entered into an agreement ("Partnership Agreement") whereby, among other things, the parties would contribute certain lead mining assets and liabilities to a partnership named The Doe Run Company. The stated purpose of the partnership was to conduct "lead business" from mining to distribution in domestic and international markets. Rothschild Dec., Exh. A ("Partnership Agreement")

§ 2.04. Although Homestake is incorporated in California and Resources in New York, both parties owned extensive lead mine and mill assets in Missouri, where the partnership was formed.

Among the assets and liabilities transferred to the partnership by Resources were those related to smelting and other facilities located near the city of Herculaneum, Missouri. Operations there were implicated a series of tort suits beginning in 1995, ("the Herculaneum cases").

The Partnership Agreement includes provisions governing indemnity and reimbursement of partners, *Id.* Art. XII, as well as those describing the resolution of disputes among partners, *Id.* Art. XIV. Article XII obliges the partnership to reimburse, with interest, any amount paid by a partner "with respect to any liability, obligation, undertaking, damage or claim for which the Partnership shall or may, pursuant to contract or applicable law, be liable or responsible." *Id.* Art. XII. Article XIV requires that "[a]ny dispute or difference between the Partners arising out of or in connection with this Agreement or as to the rights or liabilities of any Partner hereunder" be referred to the partnership committee and/or senior officials of the partners or their affiliates for resolution. Should such measures fail to resolve the dispute or difference, it shall "upon notice of arbitration given by one of the Partners, be referred to and finally settled by a panel of three arbitrators," in St. Louis, Missouri, and in accordance with the Commercial Arbitration Rules of the American Arbitration Association. *Id.* §§ 14.02–14.03.

In May, 1990, Homestake sold its shares and interest in the partnership to a third party, Fluor Corporation.

---

**1.** All facts in this section are contained in Homestake's complaint for declaratory relief and damages, unless otherwise cited.

On November 12, 1991, Homestake filed a complaint for Breach of Contract and Declaratory Relief against Doe Run and other entities in Orange County Superior Court. A series of three settlement agreements followed. Def.'s Mot. Compel Arbitration § 2; Rothschild Dec., Exhs. C ("1993 Agreement"), D ("1994 Agreement"), and E ("1997 Agreement").

In the 1994 Agreement, Doe Run Company agreed to indemnify and fully defend Homestake

> with respect to any and all matters concerning Doe Run or its operations which relate to actions or activities that occurred or which are alleged by any third party to have occurred on or after November 1, 1986, as to which Doe Run has an obligation under the Partnership Agreement or by operation of law to indemnify Homestake as a partner or former partner in Doe Run . . . .

1994 Agreement ¶ 1. The 1994 Agreement, like the 1993 Agreement, includes no arbitration clause and no forum selection clause.

Also in 1994, St. Joe's Mineral Corporation succeeded to 100% interest in the Partnership, and changed its name to The Doe Run Resources Corporation.

Beginning in 1995, Homestake and Resources, among others, were sued in a series of cases alleging bodily injury and property damages related to operations at the Herculaneum Smelter, ("the Herculaneum cases"). The alleged damages date from at least 1969 and continue up through 1990 and later. Homestake had tendered the defense of three early cases (among eleven cases, to date) to Resources by January, 1996. In the correspondence that followed, Resources acknowledged an obligation to indemnify Homestake for its defense costs and actual damages, but parties agreed to reserve issues regarding indemnity for punitive damages to a later time.

The 1997 Agreement followed up on these arrangements and provided that Doe Run was legally responsible for any and all on-site liabilities with respect to St. Joe sites (including the Herculaneum smelter) or any other sites owned or operated by The Doe Run Company, whether those liabilities arose before or after November 1, 1986. It confirmed that Doe Run must defend and indemnify Homestake against any third party claims pertaining to these on-site liabilities, which are defined as "all liabilities of any kind" resulting operations at and immediately adjacent to the sites in question. 1997 Agreement ¶¶ 1–3. The 1997 Agreement does not include an arbitration clause. The only discussion of dispute resolution instead contemplates the possibility of litigation by referencing attorneys' fees "[i]n the event of litigation." *Id.* ¶ 14.

Homestake has tendered the defense of eight additional third-party suits following the 1997 Agreement, most recently in July, 2002. Homestake's demands for defense and indemnity, as well as an April 25, 2002 request for reimbursement of legal bills through February, 2002 in the amount of $308,306.36, have not been satisfied to date. Homestake has now filed with this court a complaint for declaratory relief and damages, with jurisdiction pursuant to 28 U.S.C. section 1332, diversity of the parties.

## JURISDICTIONAL QUESTION

Federal diversity jurisdiction requires that all parties to an action are citizens of different states or citizens or subjects of a foreign state. 28 U.S.C. § 1332(a). For diversity purposes, a corporation is considered a citizen of any state in which it was incorporated and of the state where it has its principal place of business. 28 U.S.C. § 1332(c)(1).

The court raised the jurisdictional question *sua sponte* pursuant to Homestake's

failure to state a principal place of business in its complaint. Parties were invited to submit responsive pleadings on whether or not this court has diversity jurisdiction over the action.

■ Homestake contends that this court has diversity jurisdiction because (1) the appropriate jurisdictional test is the Fourth and Fifth Circuits' "functional approach" whereby a corporation that has been inactive for a substantial period of time, like Homestake, is considered a citizen only of its state of incorporation, and because (2) California is properly Homestake's only state of citizenship even if the "last business activity" test is used instead.

Resources maintains that the appropriate diversity jurisdiction test is the Second Circuit's "last business activity" test, and that under this test Homestake is properly a citizen of Missouri and the parties in this action are not diverse.

Parties' positions on the appropriate jurisdictional test for an inactive corporation reflect two of three positions adopted by various circuit courts. The circuits agree that the congressional intent behind section 1332(c)(1) was to block an otherwise local corporation from bringing litigation in federal court simply because it was incorporated in another state. *See Comtec, Inc. v. Nat'l Technical Schs.*, 711 F.Supp. 522, 523–24 (D.Ariz.1989). Substantial disagreement, however, has emerged over how the statute should apply to defunct corporations. The Third Circuit, focusing on the present tense in "the state where it *has* its principal place of business," has

posited that citizenship via a principal place of business ends when a company becomes inactive, and a defunct corporation only retains citizenship in the state of its incorporation. *See Midlantic Nat'l Bank v. Hansen*, 48 F.3d 693, 696 (3d Cir.1995), *cert. dismissed*, 515 U.S. 1184, 116 S.Ct. 32, 132 L.Ed.2d 914 (1995). The Second Circuit, noting that Congress gave no indication that principal place of business citizenship should end if a business becomes inactive, opined that such an interpretation would stray from the plain meaning of the phrase "a corporation is considered a citizen of the state in which it was incorporated *and* the state where it has its principal place of business." The Second Circuit accordingly provides for citizenship in the state in which a corporation conducted its last business transactions. *See Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc.*, 933 F.2d 131, 141 (2d Cir.1991). The Fourth and Fifth Circuits—wary of the awkward results these bright-line rules might render [2]—have opted for a middle ground approach, holding that when a substantial period of time has lapsed since a corporation was active, its citizenship reverts to include only its state of incorporation. The Fifth Circuit, in *Harris v. Black Clawson Co.*, held that the place of a corporation's last transactions is relevant to the citizenship inquiry, but as a matter of law there can be no principal place of business citizenship after a substantial period of inactivity. 961 F.2d 547, 551 (5th Cir. 1992). In *Athena Automotive, Inc. v. DiGregorio*, the Fourth Circuit found that

---

2. The Fifth Circuit was concerned that according to the Third Circuit position, "a defunct corporation, no matter how local in character, could remove a case to federal court based on its state of incorporation." *Harris v. Black Clawson Co.*, 961 F.2d 547, 550–51 (5th Cir.1992). But the court also found that "[a] rule that the place of an inactive corporation's last activity is *always determi-*

minative of its citizenship for diversity purposes ... has the potential to produce the odd result that an inactive corporation may be held to have its principal place of business in a jurisdiction in which it would never have been held to have its principal place of business while it was active." *Id.* at 551 (emphasis in original).

although a business can have a continuing impact in a locale after it has ceased operations, the three-year absence of the corporation in question was long enough to render it effectively an out-of-state citizen. 166 F.3d 288, 291–92 (4th Cir.1999).

In the absence of Ninth Circuit guidance, this court finds that the functional approach of the Fourth and Fifth Circuits best equips the court to carry out the intent of Congress. Ten years ago, in *China Basin Properties, Ltd. v. Allendale Mut. Ins. Co.*, a court in this district chose instead to follow the Second Circuit rule that an inactive corporation is a citizen of the state in which it last transacted business as well as the state in which it was incorporated. 818 F.Supp. 1301, 1303–05 (N.D.Cal.1992). It is worth noting, however, that the *China Basin* court did not find the middle ground functional approach was per se inappropriate. Rather it found that the Fifth Circuit's approach was of little help in the action before it, because the corporation had not been inactive for a "substantial period of time." *Id.* at 1304 n. 3.

More recently, in 2001, a court in this district adopted the functional approach of the Fourth and Fifth Circuit, in *Sellers v. Kohlberg & Co., LLC,* 2001 WL 761187 (N.D.Cal. Jun.29, 2001) (Alsup, J.). This is the appropriate test for the instant action as well.

This approach may render it unnecessary for the court to conduct the extensive analysis required to determine whether, while it was active, Homestake properly maintained its principal place of business in Missouri or in California. Assuming that Missouri was indeed the principal place of business when all revenue-generating activity was curtailed in 1990, if the duration of inactivity or other factors indicate that Missouri citizenship has lapsed, the court can end its jurisdictional analysis there.

Thirteen years have passed since Homestake was an active corporation in Missouri and since it has engaged in any revenue-generating activity in that or any other state. By 1993, Homestake had officially removed itself from the list of foreign corporations entitled to operate within Missouri. Between 1990 and today, Homestake has consistently represented itself as having its principal place of business in California, and it has conducted litigation in California state court as a corporation with its principal place of business here.

The functional approach requires the court to examine diversity jurisdiction on a case-by-case basis, recognizing that "[e]ven when a corporation has ceased all operations and has become inactive, the continuing impact of its business in a given locale could linger on to an extent sufficient to give it a geographical identity there as its principal place of business." *Id.* at *3 (quoting *Athena Automotive,* 166 F.3d at 291). Homestake's connection to Missouri is, indeed, particularly deep. The corporation's name, Homestake Lead Company of Missouri, its long involvement with and extensive ownership of Missouri's lead mining industry (one of the state's most important industries), and its ongoing litigation pertaining to its tenure in Missouri, all speak to Homestake's local Missouri identity. These connections are not enough, however, for Homestake to have retained any Missouri citizenship it may have acquired over thirteen years of inactivity there. If the duration of inactivity alone is not a per se stop to its Missouri citizenship, the totality of circumstances indicates Homestake's local character was sufficiently diffused that its citizenship there has effectively lapsed. Homestake took extensive steps to sever its ties to Missouri, ending Missouri operations, rescinding Missouri permits, and consistently acting the part of a California corpora-

tion with a principal place of business in California. Regardless of whether or not Homestake was a Missouri citizen in 1990, it was not one when this action was commenced, and the court finds there is complete diversity among parties to this action.

*ARBITRABILITY*

### I. Legal Standard

■■■ Federal substantive law governs the question of arbitrability. *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 719 (9th Cir.1999). Arbitration is a matter of contract and the court cannot require a party to arbitrate a dispute unless the party has agreed to do so. *United Steelworkers of America v. Warrior & Gulf*, 363 U.S. 574, 582, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960). The Federal Arbitration Act ("FAA") governs this examination. 9 U.S.C. § 4. After determining whether the contract containing the arbitration agreement evidences a transaction involving interstate commerce, and thus falls under the FAA, the court's role then is limited to (1) determining whether a valid agreement to arbitrate exists and, if it does, (2) deciding whether the agreement encompasses the dispute at issue. *Id.; Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir.2000). Both of these determinations are the province of the court. *AT & T Techs., Inc. v. Communications Workers*, 475 U.S. 643, 649, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986) (asserting that "[u]nless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator"); *Teamsters Local 315 v. Bay View Refuse Service, Inc.*, No. C–93–2736, 1994 WL 225052, at *3 (N.D.Cal. May 5, 1994) (Jensen, J.) (applying the *AT & T Techs.* principle that "there can be no doubt that the Court must determine the actual scope of jurisdiction for the arbitration"). If the finding is affirmative on both counts, then the FAA requires the court to enforce the arbitration agreement in accordance with its terms. *Chiron*, 207 F.3d at 1130. The court may only deny arbitration if "it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." *Warrior & Gulf*, 363 U.S. at 582–83, 80 S.Ct. 1347.

■■■ The preference for arbitration is particularly strong when the arbitration clause is broad. *AT & T Techs.*, 475 U.S. at 650, 106 S.Ct. 1415. Clauses requiring arbitration of claims "arising out of or relating to" a contract are considered broad. *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 398, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967) (terming as "broad" an arbitration clause covering "any controversy or claim arising out of or relating to this Agreement, or the breach thereof"). Likewise, every court that has construed the phrase "arising in connection with" within an arbitration clause has found it to be broad, "reach[ing] every dispute between the parties having a significant relationship to the contract and all disputes having their origin or genesis in the contract." *Simula*, 175 F.3d at 721.

■■■ The threshold for arbitrability is not high. *Id.* at 719. To trigger an arbitration requirement, the movant's factual allegations need only "touch matters" covered by the contract containing the arbitration clause. *See Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 624 n. 13, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985) (noting that "insofar as the allegations underlying the statutory claims touch matters covered by the enumerated articles, the Court of Appeals properly resolved any doubts in favor of arbitrability"); *Simula*, 175 F.3d at 721. Once the arbitration clause is implicated, the court must permit arbitration, "even

where the result would be the possibly inefficient maintenance of separate proceedings in different forums." *Dean Witter Reynolds, Inc. v. Byrd,* 470 U.S. 213, 217, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985).

## II. *Discussion*

The two-prong analysis requires the court to determine, first, if the arbitration clause is valid, and second, if the instant dispute falls within the scope of the arbitration clause. Homestake's arguments challenge the clause at both prongs.

### A. *Application of the clause to a "former partner"*

■ Homestake contends that the arbitration clause in the Partnership Agreement contemplates only those disputes arising among current partners of the partnership, whereas Homestake had surrendered its share in the partnership several years prior to the dispute at hand. Indeed, dispute resolution procedures expressly apply to disputes between "partners," defined as "a partner or partners of the Partnership." Partnership Agreement § 14.01 & Art. I. Homestake introduces Article VI of the Partnership Agreement to support this argument, which states in pertinent part that a former partner, having transferred its share or interest in the Partnership, is no longer subject to any obligations under the Partnership Agreement arising thereafter. *Id.* § 6.03.

■ If, as it appears, Homestake seeks to challenge the validity of the clause on this basis, its argument is misplaced. An arbitration clause may be found invalid only where the contract never existed or where there is a defect in the arbitration clause. *Gonick v. Drexel Burnham Lambert, Inc.,* 711 F.Supp. 981, (N.D.Cal.1988) (Patel, J.) (confirming that "arbitration agreements . . . are enforceable unless the agreements are invalid under [state] law governing the formation of contracts in

general"). Neither party in the instant action contends that it did not enter a valid, binding agreement in 1986. The real question before the court is whether or not the instant dispute falls within the scope of that agreement.

■ It is well settled that the court must construe the scope of an arbitration agreement liberally. *Simula,* 175 F.3d at 720 (citing *Republic of Nicaragua v. Standard Fruit Co.,* 937 F.2d 469, 479 (1991), *cert. denied,* 503 U.S. 919, 112 S.Ct. 1294, 117 L.Ed.2d 516 (1992)). Further, it is undisputed that the language of the arbitration clause in the Partnership Agreement, "arising out of or in connection with" is expansive in its coverage, according to Ninth Circuit interpretation. *See Id.,* at 721; *Tracer Research Corp. v. Nat'l Envtl. Servs. Co.,* 42 F.3d 1292, 1295 (9th Cir. 1994), *cert. dismissed,* 515 U.S. 1187, 116 S.Ct. 37, 132 L.Ed.2d 917 (1995).

■ Homestake asserts that arbitration was among the obligations that it transferred to its successor in interest when it sold its shares in 1990, and that the scope of the arbitration clause is not broad enough to reach a former partner. If this were at its core a question of the Partnership Agreement and its cancellation under section 6.03, that would be a question for the arbitrator, not the court. *See McKinney v. Emery Air Freight Corp.,* 954 F.2d 590, 593 (9th Cir.1992) (acknowledging that while disputes over whether a contract ever existed are for the court, disputes over whether a contract has been terminated or repudiated are for the arbitrator if the breadth of the clause is not in dispute); *Brotherhood of Teamsters & Auto Truck Drivers Local No. 70 v. Interstate Distrib. Co.,* 832 F.2d 507, 509–11 (9th Cir.1987) (holding that where the real dispute is not primarily over what the arbitration clause provides, but over the proper interpretation of termination provisions,

the dispute must be submitted to arbitration if the arbitration clause covers all disputes over the meaning of the agreement's terms and provisions). But here Homestake challenges the construction of the clause itself, so the court must address the question. Homestake's argument fails to persuade the court. Homestake was a partner when it assumed the obligation to arbitrate. At that time, as a partner, Homestake pledged to refer any dispute arising out of or in connection with the Partnership Agreement to arbitration upon notice of arbitration by one of the partners. The clause fixes no temporal boundaries to its application to such disputes.

 Homestake has failed to take into account "the well settled jurisprudence that holds arbitration agreements to a life and validity separate and apart from the agreement in which they are embedded." *Berkery v. Cross Country Bank,* 256 F.Supp.2d 359, 368 (E.D.Pa.2003). Supreme Court decisions dictate how this court must treat disputes that emerge following the termination of an agreement with a broad arbitration clause. In *John Wiley & Sons,* the Court determined that parties' duties under an arbitration clause survive contract termination when the dispute is over an obligation arguably created by the expired contract. *John Wiley & Sons, Inc. v. Livingston,* 376 U.S. 543, 554–55, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964). Subsequently the Court confirmed this principle and clarified its position that "where the dispute is over a provision of the expired agreement, the presumptions favoring arbitrability must be negated expressly or by clear implication." *Nolde*

*Bros., Inc. v. Local No. 358, Bakery & Confectionery Workers Union,* 430 U.S. 243, 255, 97 S.Ct. 1067, 51 L.Ed.2d 300 (1977). Although limited to disputes that have a real source in the agreement,[3] the principle applies in cases where, as here, "there was nothing in the arbitration clause that expressly excluded from its operation a dispute arising under the contract but based upon events occurring after its termination." *Id.* at 253, 97 S.Ct. 1067. The clause in question in the instant action similarly creates a duty to arbitrate that applies to a former partner as long as the dispute or difference arises out of or in connection with the Partnership Agreement's governance of that partnership. Homestake's stance, that an obligation to arbitrate cannot be compelled until a disagreement between "partners" arises, runs contrary to the clear reading of the clause, namely that at the instant it became a partner according to the terms of the Partnership Agreement, Homestake became obliged to arbitrate any disputes arising out of or in connection with the Partnership Agreement. Section 6.03 of the Partnership Agreement indeed frees Homestake from any new contractual obligations following the transfer of its share in the partnership, but it does not relieve Homestake of its preexisting duty to accept arbitration.

Through a "commonsense reading" of the paragraphs of the Partnership Agreement's dispute resolution clauses, Homestake contends that procedural rules governing the application of the arbitration clause recommend that it applies only to current partners. Section 14.01, Home-

---

**3.** The Court clarified that *Nolde Bros.* is triggered only where the dispute arises under the contract. *Litton Fin. Printing Div. v. NLRB,* 501 U.S. 190, 205–6, 111 S.Ct. 2215, 115 L.Ed.2d 177 (1991) (recognizing "[a] postexpiration grievance can be said to arise under the contract only where it involves facts and occurrences that arose before expiration, where an action taken after expiration infringes a right that accrued or vested under the agreement, or where, under normal principles of contract interpretation, the disputed contractual right survives expiration of the remainder of the agreement").

stake notes, provides that disputes should first be brought before the partnership committee and only if the committee fails to resolve matters should parties proceed to arbitration. Section 14.03 provides that each partner shall pay its share of arbitration fees. Both of these provisions are frustrated by Homestake's status as a former partner. While these provisions may be indicative of an oversight in the drafting of the Agreement, nothing in Article XIV suggests that the parties did not intend for the clause to survive the change in a partner's status. Under the FAA's presumption in favor of arbitrability, arbitration should not be denied "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Warrior & Gulf*, 363 U.S. at 582–83, 80 S.Ct. 1347. Here, a straightforward reading of the clause confirms that it will continue to reach any dispute connected with the Partnership Agreement's governance of the partnership between Homestake and Resources, regardless of the current status of either party.[4]

### B. *Paragraph 5 Exclusion*

 Homestake maintains that even if the clause applies to former partners, this type of dispute is expressly excluded from the arbitration clause. Section 14.03 of the Partnership Agreement indicates that no matter listed in Annex A shall constitute a dispute or difference to be referred to or settled by arbitration proceedings. Paragraph 5 to Annex A lists among excluded matters "[a]ny contract or arrangement between the Partnership and any Partner or an Affiliate of such Partner." Partnership Agreement Annex A ¶ 5. This court may interpret

such exclusions insofar as they may restrict the scope of the arbitration clause. *See Huber, Hunt & Nichols, Inc. v. United Ass'n of Journeymen & Apprentices of Plumbing & Pipefitting Indus., Local 38*, 282 F.3d 746, 752 n. 6 (9th Cir.2002) (noting the pitfalls but confirming that the court "may look to substantive provisions insofar as it is necessary to consider exclusions to an arbitration clause") (internal quotations omitted), *cert. denied*, 537 U.S. 942, 123 S.Ct. 342, 154 L.Ed.2d 249 (2002).

Homestake's position is that in light of Paragraph 5, even were it possible for a dispute involving a former partner to be contemplated by the arbitration clause, now that Resources has succeeded to a 100% interest in the Partnership the instant dispute is barred for its connection to an agreement between a former partner and the partnership itself. To adopt such a view would require the court to accept that the Partnership Agreement was transformed into an entirely different document when Resources succeeded to full control over the partnership. The court cannot follow Homestake down this road. The Partnership Agreement is an arrangement between two partners governed by a valid arbitration clause. It is neither an arrangement between a former partner and a partner, nor an arrangement between a former partner and the partnership itself. As partners, in November 1986, Homestake and Resources committed to accept arbitration over any disputes arising out of or in connection with the Partnership Agreement that then bound them to one another. Any other interpretation of the clause or its Paragraph 5 exclusion would be a strained interpretation running contrary to the FAA's pre-

---

4. Homestake itself seems to rely on the rights and liabilities of "partners" applying equally to former partners. In its complaint Homestake bases Resources' obligations, in part, upon the terms of the Partnership Agreement requiring the Partnership to reimburse amounts paid by a "partner" with respect to liabilities or damages for which the partnership is responsible. Pl.'s Compl. ¶¶ 9, 24; Partnership Agreement Art. XII.

sumption in favor of arbitrability. The court need not determine whether the Paragraph 5 exclusion could apply to the 1993, 1994 and 1997 Agreements as long as the dispute arises out of or in connection with the Partnership Agreement, and the subsequent agreements do not unambiguously strike the Partnership Agreement's arbitration clause. These matters are properly addressed in light of Homestake's final argument.

### C. *Effect of subsequent agreements on the arbitration clause*

Homestake finally advances the view that Resources' current defense and indemnity obligations are rooted in agreements executed after Homestake was no longer a partner, and those agreements, interpreted in light of Resources' behavior in this period, should control.

 An arbitration clause does not govern a dispute based on a subsequent agreement or contract that has no connection to the prior agreement requiring arbitration. *Int'l Ambassador Programs, Inc. v. Archexpo*, 68 F.3d 337, 340 (9th Cir. 1995), *cert. denied*, 517 U.S. 1167, 116 S.Ct. 1567, 134 L.Ed.2d 666 (1996). Courts have also held that "[w]here the arbitration clause is narrow, a collateral matter will generally be ruled beyond its purview." *See Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.*, 252 F.3d 218, 224 (2d Cir.2001), *cert. denied*, 534 U.S. 1020, 122 S.Ct. 546, 151 L.Ed.2d 423 (2001). In the instant action, however, the arbitration clause is broad, and the subject matter of the dispute, while the immediate focus of a subsequent agreement (the 1997 Agreement), is certainly germane to the Partnership Agreement.

 An arbitration clause can also fail where a subsequent agreement supersedes the arbitration clause with a "clear and specific waiver." *WorldCrisa Corp. v. Armstrong*, 129 F.3d 71, 75 (2d Cir.1997).

Absent the explicit intention to rescind an arbitration clause, however, the clause will survive even where the prior agreement itself is rescinded by the latter agreement. *Berkery*, 256 F.Supp.2d 359, 368–69.

This principle does not favor Homestake's claim. Not only is Homestake's complaint expressly grounded, in part, on the Partnership Agreement, but the 1997 Agreement expressly incorporates the Partnership Agreement, stating that except for "specific terms of this Agreement [which] shall expressly supersede and govern over any contrary or different terms," all other terms and conditions of the November 1986 Partnership Agreement remain in full force and effect. 1997 Agreement ¶ 5. Homestake reasonably could contend that arbitration was not on the minds of the parties as they drafted the subsequent Agreements, but it cannot make the necessary showing that parties intended to strike the arbitration clause.

Indeed, even without the express incorporation of the Partnership Agreement, the court would require a stronger showing than Homestake has made. The analysis of another partnership agreement by a court in this district reached a similar conclusion, finding that "[i]f the subsequent agreement ... was intended to be a new financial arrangement that was outside of the [original agreement's] arbitration scope, the Court would have expected the parties to expressly state so in the [subsequent] contract, rather than merely choosing to execute the contract in California and omit an arbitration provision." *Dandong Shuguang Axel Corp., Ltd. v. Brilliance Machinery Co.*, No. C 00–4480, 2001 WL 637446 at *4 (N.D.Cal. Jun.1, 2001) (Conti, J.).

Likewise, the mere contemplation of the possibility of litigation in the 1997 Agreement is not enough to show the parties intended to supersede the arbitration

clause; an active arbitration clause and the possibility of litigation are not mutually exclusive. *See Kvaerner ASA v. Bank of Tokyo–Mitsubishi, Ltd., New York Branch,* 210 F.3d 262, 267 (holding that a consent to jurisdiction clause in a subsequent agreement does not revoke the party's right to arbitrate any disputes arising out of an underlying agreement containing a valid arbitration clause).

■ Nor is Resources' acquiescence to litigation for resolving the 1991 dispute an unambiguous indication that the parties no longer intended the arbitration clause in the Partnership Agreement to continue in its effect. Homestake posits that Resources' response to previous litigation confirms an "understanding that the Partnership Agreement's dispute resolution provisions do not apply to the ongoing defense and indemnity disputes between these non-partner entities." Def. Opp. Mot. Compel Arbitration § 3C. Homestake nowhere expressly declares, however, that Resources' conduct resulted in constructive waiver of its arbitration rights, and the court sees no demonstration that the Ninth Circuit's three-prong test for constructive waiver has been satisfied.[5] *See*

*United Computer Sys., Inc. v. AT & T Corp.,* 298 F.3d 756, 765 (9th Cir.2002).

The ambiguous inferences presented by Homestake fail to provide the clear supersession of the arbitration clause necessary to defeat the presumption of arbitrability. The second prong of this court's analysis is therefore satisfied, and the court must enforce the arbitration clause.

*ARBITRATION VENUE*

■ In granting Resources' motion, the court must determine where it can properly compel arbitration. The Ninth Circuit's 1941 decision in *Continental Grain Co. v. Dant & Russell* remains the controlling authority, in spite of various challenges from other circuits. 118 F.2d 967, 968–69 (9th Cir.1941); *see also Sovak v. Chugai Pharm. Co.,* 280 F.3d 1266, 1271 n. 1 (9th Cir.2002) (comparing the Ninth Circuit position with a Fifth Circuit holding in *Dupuy–Busching Gen. Agency v. Ambassador Ins. Co.,* 524 F.2d 1275, 1276–78 (5th Cir.1975)), *cert. denied,* 537 U.S. 825, 123 S.Ct. 114, 154 L.Ed.2d 37 (2002). *Continental Grain* interprets section 4 of the FAA as limiting courts to ordering arbitration within the district in which the suit was filed. The Ninth Circuit has indirectly confirmed this interpretation recent-

---

**5.** Ninth Circuit jurisprudence recognizes that waiver of a contractual right to arbitrate is not favored, and must be examined in light of the strong federal policy favoring enforcement. *Fisher v. A.G. Becker Paribas Inc.,* 791 F.2d 691, 694 (9th Cir.1986) (citing *Lake Communications, Inc. v. ICC Corp.,* 738 F.2d 1473, 1477 (9th Cir.1984), *overruled on other grounds, Mitsubishi Motors,* 473 U.S. 614, 632–35, 105 S.Ct. 3346 (1985)), and *Shinto Shipping Co., Ltd. v. Fibrex & Shipping Co.,* 572 F.2d 1328, 1330 (9th Cir.1978). Hence, any party arguing waiver of arbitration bears a heavy burden of proof. *Belke v. Merrill Lynch, Pierce, Fenner & Smith,* 693 F.2d 1023, 1025 (11th Cir.1982).

A three-prong test for constructive waiver of the right to arbitrate has been applied consistently in Ninth Circuit rulings. Waiver is established if the following conditions are met: (1) the waiving party must have knowledge of an existing right to compel arbitration; (2) there must be acts by that party inconsistent with such an existing right; and (3) there must be prejudice resulting from the waiving party's inconsistent acts. *United Computer Sys.,* 298 F.3d at 765;. A survey of cases reveals the high bar the Ninth Circuit has set for satisfying each of the three conditions. *See Id.; Global Sec. & Communications, Inc. v. AT & T,* 191 F.3d 460, 1999 WL 513873, *2 (9th Cir.1999); *Lake Communications,* 738 F.2d at 1477; *Van Ness Townhouses v. Mar Indus. Corp.,* 862 F.2d 754, 759 (9th Cir.1988); *Hoffman Const. Co. v. Active Erectors,* 969 F.2d 796, 798–99 (9th Cir.1992), *cert. denied,* 507 U.S. 911, 113 S.Ct. 1258, 122 L.Ed.2d 656 (1993).

ly, stating that "by its terms, § 4 only confines the *arbitration* to the district in which the petition to compel is filed." *Textile Unlimited, Inc. v. A..BMH and Co., Inc.*, 240 F.3d 781, 785 (9th Cir.2001) (emphasis in the original).

This court shares the concern of the Seventh Circuit that under such an interpretation "[a]ny party to an arbitration agreement could avoid the effect of the agreed-to forum merely by filing suit in a different district. This in turn could lead to the parties racing to different courthouses to obtain what each thinks is the most convenient forum for it, in disregard of its contractual obligations." *Snyder v. Smith*, 736 F.2d 409, 419–20 (7th Cir.1984), *cert. denied*, 469 U.S. 1037, 105 S.Ct. 513, 83 L.Ed.2d 403 (1984), *overruled on other grounds, Felzen v. Andreas*, 134 F.3d 873 (7th Cir.1998). Absent new guidance from the Ninth Circuit, however, the court is precluded from ordering arbitration in the contractually-designated forum of St. Louis, Missouri.

A surprisingly parallel case recently decided in the Southern District of New York arrived at a similar conclusion. *Indian Harbor Ins. Co. v. Global Transp. Sys., Inc.*, 197 F.Supp.2d 1 (S.D.N.Y.2002). That court, while ordering arbitration to proceed in New York rather than the contractually-designated forum of San Juan, took some comfort in the fact that both parties had submitted to its jurisdiction, the one by filing its action there, the other by moving to compel arbitration there (rather than simply moving to dismiss the action). Quoting *Continental Grain*, the *Indian Harbor* court reasoned that the movant, "having invoked the jurisdiction of the United States District Court for [the Southern District of New York] is hardly in a position to complain that it has exercised that jurisdiction in accordance with the statute giving it jurisdiction." *Id.* at 4

(quoting *Continental Grain*, 118 F.2d at 969).

Furthermore, in this case no compelling reasons justify denying arbitration because of the forum clause. Indeed, the post–1986 agreements which are in issue here make clear that the 1986 agreement remains in full force and effect except as superseded by the subsequent agreements. Although the post–1986 agreements are silent on arbitration and forum selection they do provide, contrary to the 1986 agreement designating Missouri law, that the governing law shall be that of California. Thus, it is not unreasonable to order arbitration within this district where California law would ordinarily apply. It will be the task of the arbitrators to determine which aspects of the dispute are governed by Missouri law and which are governed by California law. In any event, the provisions of the 1986 agreement mandating arbitration remain in effect and are not superseded by or inconsistent with the post–1986 agreements.

*CONCLUSION*

For the foregoing reasons, the court GRANTS defendant's motion to compel arbitration and stay proceedings, and ORDERS arbitration proceedings to be initiated in San Francisco, California.

IT IS SO ORDERED.