Neela PATEL and Sean Paxton, on their own behalf and on behalf of all other similarly situated individuals, Plaintiffs,

v.

SUGEN, INC., et al, Defendants.

No. C–04–2884 VRW.

United States District Court, N.D. California.

Jan. 4, 2005.

Jeffrey Lewis (argued) and Cassie Springer–Sullivan, Lewis, Feinberg, Renaker & Jackson, P.C., Oakland, CA, Michael Rubin and Linda Lye, Altshuler, Berzon, Nussbaum, Rubin & Demain, Cliff Palefsky and Keith Ehrman, McGuinn, Hillsman & Palefsky, San Francisco, CA, for Plaintiffs.

Sue J. Stott and Katherine S. Richey (argued), Jones Day, San Francisco, CA, for Defendants.

ORDER

WALKER, Chief Judge.

This case is brought by two former employees ("plaintiffs") of defendant Sugen, Inc ("Sugen"), on behalf of a putative class of former Sugen employees. Sugen has ceased operations.

Plaintiffs' claims arise out of a dispute as to the correct amount of certain payments made at the end of their employment. Two payments are in dispute: One was paid as severance (the "severance payment"); the other, which the court will refer to as the "incentive payment," was a pro-rated share of each employee's bonus for the months worked in 2003 before termination.

Plaintiffs filed suit in California state court seeking three elements of claimed damages: (1) the difference between their actual severance payments and the (larger) severance payments to which they claim to be entitled; (2) the difference between their actual incentive payments and the (larger) incentive payments to which they claim to be entitled; and (3) recovery for fraud and misrepresentation claims related to these disputes. Compl. (Doc. # 1 Ex. A). Defendants, contending that plaintiffs' claims of entitlement trace only to plans governed by the Employee Retirement Income Security Act of 1974 (ERISA), removed the case to this court. Notice Removal (Doc. # 1). Along with their assertion of 29 USC § 1132(e) ERISA exclusive federal jurisdiction, defendants also assert 28 USC § 1332 diversity jurisdiction. Notice Removal (Doc. # 1).

Plaintiffs move to remand the case to state court on the ground that this court lacks subject matter jurisdiction, that is, that this court does not have ERISA jurisdiction because plaintiffs claim entitlements under contracts governed by state law, not ERISA, and that this court does not have diversity jurisdiction because Sugen is not diverse from plaintiffs. Mot. Remand (Doc. # 12). Defendants have moved to dismiss the complaint for failure to state a claim under FRCP 12(b)(6). Mot. Dismiss (Doc. # 8).

The motion to remand is logically antecedent to the motion to dismiss, but because both address the same ERISA preemption issues, the court has considered the papers filed in connection with both motions in evaluating the motion to remand. The court concludes, based on its understanding of plaintiffs' very narrow position on the source of their claims to

entitlement, that this is not an ERISA case, and the court therefore lacks ERISA jurisdiction under 29 USC § 1132(e). The court further concludes that defendant Sugen should be treated as a citizen of California for purposes of 28 USC § 1332(c)(1). As plaintiffs are citizens of California, the parties are nondiverse and the court lacks diversity jurisdiction. Accordingly, pursuant to 28 USC § 1447(c), the court GRANTS plaintiffs' motion to remand (Doc. # 12). Defendants' motion to dismiss (Doc. # 8) is TERMINATED as moot.

## I

The general background facts that follow are taken from plaintiffs' complaint, with some of the particulars drawn from documents annexed to plaintiffs' complaint or the parties' declarations. This case arises from Pfizer, Inc's ("Pfizer") April 2003 acquisition of Pharmacia Corp. ("Pharmacia"). Compl. (Doc. # 1 Ex. A) ¶ 23. Sugen, which employed plaintiffs at the time of the acquisition, was a wholly owned subsidiary of Pharmacia and thus was indirectly acquired by Pfizer. *Id.* Shortly after the acquisition, Sugen announced it would lay off all its employees and cease operations in 2003. Sugen, a Delaware corporation with its principal (indeed, only) place of business in California, is now inactive for all practical purposes.

The layoffs attendant to Sugen's shutdown occurred in waves. *Id.* ¶¶ 24–25. Under preexisting plans and/or agreements entered into in anticipation of the layoffs, plaintiffs were to receive certain payments upon their departure. This case concerns the amounts of those payments, which fall into two categories—the severance payments and the incentive payments—with somewhat different backgrounds.

## A

The severance payments have their roots in the Pharmacia Separation Benefit Plan (the "separation benefit plan"). Mot. Dismiss (Doc. # 8) Ex. 1. The separation benefit plan details the benefits (both monetary and health) to be paid to employees leaving Pharmacia (or a subsidiary such as Sugen) under certain specified circumstances. The court will rescribe and discuss the relevant plan language at appropriate points in its discussion.

Shortly before their actual termination dates, plaintiffs each received a set of materials including a document captioned "Sugen Personalized Pay Statement" (the "personalized statements"). These statements described the parameters and amounts of various types of payments that defendants would make to plaintiffs upon their termination, including the severance payments and the incentive payments. With respect to her severance payment, plaintiff Patel's personalized statement states, in relevant part, "As a result of your Acquisition Termination, you are eligible to receive a severance payment provided you have returned your signed Release Agreement. In accordance with the Pharmacia Separation Benefit Plan (as amended December 23, 2002), your severance payment will be $118,359.30." Compl. (Doc. # 1 Ex. A) Ex. A. Plaintiff Paxton received a similar personalized statement, with a different payment amount. *Id.* Ex. B.

Also included in each plaintiff's set of materials was a release agreement (the "release agreement"). *Id.* Exs. C, D. The release agreements are substantially identical. Plaintiff Patel's provides that, in consideration of $118,359.30, she agrees, among a number of other things, to release all claims against Pfizer and Pharmacia. Plaintiff Paxton's release agreement contains similar provisions, with a different

severance payment. Neither release agreement references the separation benefit plan.

Plaintiffs signed and returned the release agreements. Compl. (Doc. # 1 Ex. A) ¶¶ 33–34. Defendants did not pay the amounts identified in plaintiffs' release agreements; rather, shortly after plaintiffs left Sugen, defendants claimed that the amounts stated in the release agreements represented a computational mistake, and defendants supplied substitute release agreements with corrected (and smaller) amounts. *Id.* ¶¶ 41–55. Plaintiffs seek to recover the difference between the severance payments stated in the original release agreement and the severance payments they actually received (as stated in the substitute release agreement).

### B

Plaintiffs' second claim is for incentive payments. As Sugen employees, plaintiffs were subject to the Pharmacia Annual Incentive Plan (the "Pharmacia AIP"). After Pfizer acquired Pharmacia, the Transitional Annual Incentive Plan for Legacy Pharmacia Participants (the "transitional AIP") replaced the Pharmacia AIP. The transitional AIP was effective for the 2003 calendar year. The transitional AIP (and apparently the Pharmacia AIP, though the court does not have relevant documents before it) were essentially structured bonus compensation plans, under which incentive payments (i.e., bonuses) were computed based on each employee's salary, preestablished target incentive rate and actual achievement rate (as measured against a preestablished set of objectives). An employee's actual achievement rate was computed by adjusting his target incentive rate upward or downward, based on his actual achievement rate. Thus an employee who exceeded his objectives would have an actual incentive rate that exceeded his target incentive rate, and,

accordingly, that employee would receive a larger bonus.

Incentive payments under the transitional AIP were to be paid as lump sum awards in March of the year following the plan year (i.e., payments were to be made in March 2004). The transitional AIP recognized, however, that due to the Pfizer acquisition, some employees would not be employed for the all of 2003. Accordingly, the transitional AIP incorporated the definition of "termination due to change in control" from the separation benefit plan to provide that employees terminated under such circumstances would be "eligible for a prorated award that reflects your actual months of AIP participation during the Plan year \* \* \* at the time of our termination." *Id.* at 10. The transitional AIP further provided that the "prorated award will be calculated using your incentive target percent (not actual performance)." *Id.*

Plaintiffs' claim with respect to incentive awards concerns whether they were to be compensated based on their target incentive rates or their actual incentive rates from the last full year of employment (i e, 2002). Plaintiffs assert that they should have been paid based on their actual 2002 incentive rate, which was greater for each plaintiff than the corresponding target incentive rate. Compl. (Doc. # 1 Ex. A) ¶¶ 20–22. To be sure, the terms of the transitional AIP could not be clearer: The payment under the transitional AIP was to be "calculated using your *incentive* target percent (not *actual* performance)." Mot. Dismiss (Doc. # 8) Ex. 3 at 10 (emphasis added). But plaintiffs do not rely on the transitional AIP. Instead, they allege that defendants' management made repeated oral representations that incentive payments would be made based on actual 2002 incentive rates, not on 2003 target incentive rates. See Compl. (Doc. # 1 Ex. A)

¶ 26. Plaintiffs also point to their personalized pay statements, which reported incentive rates that suggested they would indeed be receiving pro rated incentive payments based on their actual 2002 incentive rates. The release agreement, which accompanied each personalized statement and which addresses severance payments, does not address incentive payments.

As with the severance payments, defendants asserted that the original personalized statements' representations about the incentive payments were the product of clerical mistakes. Defendants provided substitute personalized statements and ultimately paid plaintiffs based on their 2003 target incentive rate, not their actual 2002 incentive rate. Plaintiffs now seek to recover the difference between incentive payments based on the actual 2002 incentive rates (which defendants did not make) and the incentive payments based on target 2003 incentive rates (which defendants did make).

## II

■ Defendants removed this case from state court on the ground of complete preemption under ERISA, or, in the alternative, diversity jurisdiction. Notice Removal (Doc. # 1) ¶ 8–11. Plaintiffs move to remand the case for lack of subject matter jurisdiction. See 28 USC § 1447(c) ("If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded."). Defendants assert two grounds for federal jurisdiction, 29 USC § 1132(e) (because the case arises under ERISA and is thus within the exclusive jurisdiction of the federal courts) and 28 USC § 1332 (because the action is among parties of diverse citizenship and the amount in controversy exceeds $75,000). Defendants have the burden of proof. See *Gaus v. Miles, Inc.*, 980 F.2d 564, 566 (9th Cir.1992) ("We strictly construe the removal statute against removal jurisdiction. Federal ju-

risdiction must be rejected if there is any doubt as to the right of removal in the first instance." (citations omitted)). The court will address ERISA's jurisdictional provision first.

### A

■ Federal jurisdiction is normally measured by the yardstick of the well-pleaded complaint rule. "Under this rule, 'a cause of action arises under federal law only when the plaintiffs' well-pleaded complaint raises issues of federal law.' For removal to be appropriate, a federal question must appear on the face of the complaint." *Toumajian v. Frailey*, 135 F.3d 648, 653 (9th Cir.1998) (quoting *Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58, 63, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987) and citing *Franchise Tax Board v. Construction Laborers Vacation Trust*, 463 U.S. 1, 9–10, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983)). A corollary to the well-pleaded complaint rule—one that gives content to "well-pleaded"—is the doctrine of complete preemption. "Congress may so completely preempt a particular area that any civil complaint raising this select group of claims is necessarily federal in character." *Metropolitan Life*, 481 U.S. at 63–64, 107 S.Ct. 1542.

■ State law claims of the sort that plaintiffs have pled—breach of contract and so forth—are completely preempted under conditions set forth in *Metropolitan Life*. If a "state law claim '*relates to*' an ERISA plan within the meaning of [29 USC] § 1144(a) and falls *within the scope* of ERISA's civil enforcement found in [29 USC] § 1132(a) [, then] state claims are completely preempted by ERISA and converted to federal questions." *Toumajian*, 135 F.3d at 654 (citing *Metropolitan Life*, 481 U.S. at 66, 107 S.Ct. 1542) (emphasis added). But if both conditions are not met in a case pleading only state-law causes of

action, "the federal court does not have subject matter jurisdiction and the matter should be remanded." *Id.*

The *Metropolitan Life* inquiry is two-fold, raising the question of which prong should be addressed first. From one point of view, the question whether there is a statutory provision to enforce a plan's terms is meaningless unless one first concludes that there *is* an ERISA plan related to plaintiffs' claims. From another point of view, if one *assumes* the existence of such a plan, it seems easy to characterize plaintiffs' claims here as claims for recovery of wrongfully denied benefits under 29 USC § 1132(a)(1)(B). In any event, the court does not reach the question whether plaintiffs' claims could be brought under ERISA's civil enforcement provision because, as explained in detail below, the "relates to" inquiry is dispositive of this case. Accordingly, the court will discuss only the law bearing on the first prong of *Metropolitan Life:* whether a state law claim "relates to" an ERISA plan.

■ ERISA's supersession clause, 29 USC § 1144(a), provides that "the provisions of [ERISA] shall supersede any and all state laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a)." "This broadly worded provision is 'clearly expansive.'" *Egelhoff v. Egelhoff*, 532 U.S. 141, 146, 121 S.Ct. 1322, 149 L.Ed.2d 264 (2001) (quoting *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995)). The first task is to determine whether the "plans" at issue here—the separation benefit plan and the transitional AIP—are "plans" within the meaning of 29 USC § 1003(a). Assuming the court does find these to be ERISA plans, the court must next determine whether plaintiffs' claims do in fact "relate to" the plans.

ERISA extends "to any employee benefit plan if it is established or maintained—(1) by any employer engaged in commerce * * *." 29 USC § 1003(a). Because defendants are clearly employers engaged in commerce, the question is whether the plans here are "employee benefit plans." That term is defined in 29 USC § 1002(3): "The term 'employee benefit plan' or 'plan' means an employee welfare benefit plan or an employee pension benefit plan or a plan which is both * * *." Accordingly, the court will look to the caselaw interpreting this definition in the context of severance benefit plans (which the separation benefit plan plainly is, and the transitional AIP also is, to the extent that it provides payment upon termination).

To the question "are severance plans subject to ERISA?" one treatise helpfully answers, "Sometimes." John F Buckley, *ERISA Law Answer Book* Q1:52 (Aspen, 4th ed 2003 & 2005 Supp). Fortunately, the treatise elaborates:

> Severance pay is clearly a benefit of a type that is subject to ERISA and is not included in the class of benefits that are exempt as payroll practices * * *.

> In *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987), the U.S. Supreme Court held that a severance plan is subject to ERISA only if it requires an ongoing administrative scheme.

*Id.*

A trilogy of Ninth Circuit cases further interprets *Fort Halifax*. *Bogue v. Ampex Corp.*, 976 F.2d 1319 (9th Cir.1992), concerned a program providing severance benefits for certain of defendant's key executives (including plaintiff) in the event defendant was sold. Severance would be paid if "neither [defendant's parent company] nor the buyer [of defendant] offers you 'substantially equivalent' employment and your employment is terminated." Id at

1321. In turn, "'substantially equivalent employment' was defined as a job that included 'responsibilities similar'" to those the executive already had. *Id.* The determination as to what was "substantially equivalent employment" was to be made by defendant's parent company.

The *Bogue* court held that this severance plan was covered by ERISA. Looking to *Fort Halifax,* and adopting the Fifth Circuit's approach in *Fontenot v. NL Industries, Inc.,* 953 F.2d 960 (5th Cir.1992), the court held that the determinative issue is "whether the plan in question requires an administrative scheme because the circumstances of each employee's termination have to be analyzed in light of certain criteria." *Bogue,* 976 F.2d at 1323 (alterations and quotation marks omitted). Applying that principle to the facts, the court found that the determination whether an employee had been offered "substantially equivalent employment" required an administrative scheme to effect discretionary application of the plan terms. *Id.*

The Ninth Circuit again applied the "administrative scheme" test in *Delaye v. Agripac, Inc.,* 39 F.3d 235, 237 (9th Cir. 1994) (citing *Bogue* ), but reached a different result:

> Delaye's contract does not implicate an ongoing administrative scheme. Once Agripac decided to terminate Delaye, the severance calculation became one akin to that in *Fort Halifax*—a straightforward computation of a one-time obligation. The obligation was either to pay Delaye his regular salary prorated to the date of his termination, if he was terminated for cause; or pay him a fixed monthly amount for twelve to twenty-four months according to a set formula, plus accrued vacation pay and insurance benefits, if he was terminated without cause. While payment could continue for as long as two years, there is nothing discretionary about the timing, amount

or form of the payment. Sending Delaye, a single employee, a check every month plus continuing to pay his insurance premiums for the time specified in the employment contract does not rise to the level of an ongoing administrative scheme.

*Id.*

The *Delaye* court distinguished *Bogue* on two grounds: First, *Bogue* concerned a plan that required an ongoing administrative scheme to make discretionary determinations about what constituted "substantially equivalent employment." *Id.* at 237–38. Second, the *Bogue* plan applied to ten executives, in contrast to the *Delaye* plan which applied to only one. *Id.* at 238.

█ Finally, the Ninth Circuit looked to both *Bogue* and *Delaye* in evaluating the plan in *Velarde v. PACE Membership Warehouse, Inc.,* 105 F.3d 1313 (9th Cir. 1997). The *Velarde* plan was embodied in a "stay on letter" designed to retain certain employees through the wind-up of defendant's business by promising them a severance payment. The stay on letter contained two eligibility requirements: "(1) that the employees perform their duties in a satisfactory manner, and (2) that the employees not be terminated for cause before [a] specified date." *Id.* at 1316–17. Defendant argued that this was an ERISA plan because the eligibility requirements would necessitate an ongoing administrative scheme involving particularized discretion. The court disagreed, locating the stay on letter closer to the *Delaye* plan than the *Bogue* plan. The court signaled that the relevant criterion was the precise quantum of discretion required by the plan:

> Here, as in *Delaye,* the employer was simply required to make a single arithmetical calculation to determine the amount of the severance benefits. While in both [*Delaye* and *Bogue* ], a

"for cause" termination would change the benefits due to the employee, the *Delaye* court did not deem this minimal quantum of discretion sufficient to turn a severance agreement into an ERISA plan. Contrary to PACE's assertions, the key to our holding in *Bogue* was that there was "*enough* ongoing, particularized, administrative discretionary analysis," 976 F.2d at 1323 (emphasis added), to make the plan an "ongoing administrative scheme," not that the agreement simply required some modicum of discretion. The level of discretion, if any, which PACE was required to exercise in implementing the agreement was slight. It failed to rise to the level of ongoing particularized discretion required to transform a simple severance agreement into an ERISA employee benefits plan. *Id.* at 1317. Thus the determination whether a plan is covered by ERISA is in some sense one of degree. As *Bogue*, *Delaye* and *Velarde* illustrate, this is a determination the court may properly make on an undisputed factual record regarding the plan, such as is now before the court.

## B

Several interlocking provisions of the separation benefit plan control whether an employee is eligible for change of control severance benefits under the separation benefit plan. Section 3.01 of the separation benefit plan makes an employee eligible for a severance payment in the event of, inter alia, a termination due to change in control. Section 2.24 defines "termination due to change in control" as "termination of an employee's employment by the company within two years of a change in control that is involuntary or that is as a result of his or her rejection of an offer of continued employment with the company or an affiliate if such employment is not a comparable position." Thus, an employee is ineligible under the change in control

provisions if he is offered (but rejects) a comparable position. "Comparable position" is defined in section 2.06 as any employment with the company except jobs that (a) require physical relocation over 50 miles or to a new state, (b) require materially increase[d] business travel or (c) are a "demotion." Section 2.08 in turn defines "demotion" in terms of Pharmacia's compensation guidelines and "a company-recognized career ladder."

Under some circumstances, the separation benefit plan unambiguously requires a severance payment—such as when an employee is outright terminated upon a change in control, or is only offered a position in another state. Other circumstances call for a more complex determination by posing questions with less certain answers: What amounts to a *material* increase in business travel? How does the company establish its career ladder? How are the compensation guidelines interpreted? At a minimum, these questions require intimate familiarity with the nuances of the company heirarchy and the job duties of different positions.

■ Like the plan in *Bogue*, the separation benefit plan here necessarily vests significant discretion in its administrators. It does not matter that the plan does not use "magic words" to confer this discretion; as the *Bogue* court observed "[w]hether or not [the company] ever thought it would have to administer an ERISA plan does not matter; there was no way to administer the plan without an administrative scheme." 976 F.2d at 1323. Needless to say, the question is not whether any of the terminations at issue in this suit actually required the exercise of discretion—it may be that no Sugen employee was offered continued employment elsewhere at Pfizer—but rather whether the plan in the abstract required an administrative scheme for discretionary decision-

making. It did, and accordingly the court holds that the separation benefit plan is covered by ERISA.

█ The next question is whether plaintiffs' claim "relates to" this plan. Plaintiffs' complaint and moving papers indicate otherwise. "Plaintiffs' claims for severance pay arise from the original release agreements which each laid-off Sugen employee executed prior to termination, not from the separation benefit plan." Mot. Remand (Doc. # 12) at 4:26–28. The claim is unusual perhaps, but entirely clear: Plaintiffs assert that the release agreement was a "valid and binding contract" entirely separate from the separation benefit plan. Compl. (Doc. # 1 Ex. A) ¶¶ 36–38. The overlapping subject matter of the release agreement and the separation benefit plan—they both operate upon an employee's termination—does not control the "relates to" inquiry. If it did, every agreement made by Pharmacia that addressed employee termination would "relate to" an ERISA plan. The "relate to" concept is expansive, but it is not all-encompassing. See *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995) ("If 'relate to' were taken to extend to the furthest stretch of its indeterminacy, then for all practical purposes pre-emption would never run its course, for '[r]eally, universally, relations stop nowhere.'" (citing Henry James, *Roderick Hudson* xli (World's Classics, New York ed 1980)) (alteration in original)).

Plaintiffs liken their case to *Eide v. Grey Fox Technical Services Corp.*, 329 F.3d 600 (8th Cir.2003). The court agrees. The *Eide* plaintiffs alleged that their employer, Ceridian, made an oral promise to them regarding their severance benefits in the event their unit was sold to another company. In substance, the promise was that, should the buyer terminate the employees within one year of the unit's sale, Ceridian would pay them a lump sum severance equal to what they would have received under Ceridian's existing ERISA-covered severance plan. When they were terminated shortly after the sale of their unit, Ceridian refused to pay, and plaintiffs filed suit in state court. Defendants removed the case to federal court. The district court held that removal was proper because plaintiffs' claim was completely preempted by ERISA. Upon recharacterizing plaintiffs' claim as a claim for benefits due under ERISA, the district court granted summary judgment for defendants. *Id.* at 603–04.

On appeal, the Eighth Circuit reversed, holding that the district court lacked removal jurisdiction. "No 'ongoing administrative scheme' is required for Ceridian to meet its obligations to [plaintiffs]. Once [the buyer] terminated [plaintiffs], 'there was nothing for [Ceridian] to decide, no discretion for it to exercise, and nothing for it to do but write a check.'" *Id.* at 606 (quoting *Kulinski v. Medtronic Bio–Medicus, Inc.*, 21 F.3d 254, 258 (8th Cir.1994)) (fourth alteration in original). Ceridian's promise "constituted a free-standing contract providing severance payments upon the occurrence of some future contingency." *Id.* at 607. The same is true here (or at least as plaintiffs have pled their claims, and as their papers represent they will pursue them): The release agreement can be read as a free-standing contract that provides for a one-time lump-sum payment in exchange for a release of all claims and other consideration.

Plaintiffs' chosen interpretation of the release agreement as a separate non-ERISA agreement is tenable in light of the separation benefit plan's provisions. Two plan provisions are significant. Section 3.02 of the separation benefit plan provides:

*Waiver and Release.* Notwithstanding anything in this Plan to the contrary, unless determined otherwise by Pharmacia, no Benefit shall be due or paid under the Plan to any Terminated Employee, unless the Terminated Employee executes (and does not rescind) a written waiver and release, in a form prescribed by Pharmacia, of all claims against Pharmacia, its affiliates and all related parties arising out of the Employee's employment or termination of employment.

Section 4.03 of the separation benefit plan provides:

*Individual Written Agreements.* The Company may enter into written agreements between the Company and an individual Employee relating to the amount of separation benefits payable under the Plan. Such individual written agreements shall be approved by the Senior Vice President, Human Resources, acting on behalf of the Company. Other than the amount of separation benefits specified in the individual written agreement, all other terms and provisions of this Plan shall apply to any Employee's entitlement to separation benefits for as long as this Plan is in effect.

First, although section 3.02 of the separation benefit plan requires terminated employees to execute releases in order to receive benefits, and section 4.03 contemplates side agreements specifying the exact amount of benefits to be paid to an employee, the release agreement conspicuously omits any reference to these sections. In fact, the release agreement mentions the separation benefit plan by name *only* in paragraph 15, which merely states a formula for computing the period of time in which the employee cannot seek employment with Pfizer. Paragraph 5 of the release agreement contains what may be a reference to the separation benefit plan:

This release agreement extends to any claims that I may have with respect to any separation plans or programs that have been offered by the company in the past. This release agreement does not extend to any rights to which I may be entitled under any of the company's other employee benefit plans, by reason of my employment with the company, that cannot legally be waived, including any rights or benefits to which I am entitled as a result of signing this release agreement."

The court is unwilling to use this opaque language as the necessary link in the "relates to" chain. The release agreement fails to state its connection to section 3.02 or 4.03 of the separation benefit plan. The contract interpretation maxim of *contra proferentem* bolsters this conclusion: Defendants clearly were the drafters of this contract (after all, each plaintiff received a nearly identical copy) and had every opportunity to shape it to their needs. To the extent the quoted language above is even ambiguous, it must be read in plaintiffs' favor—as a freestanding contract, separate from the ERISA-covered separation benefit plan.

The second reason for interpreting the release agreement as a separate non-ERISA contract is that it exceeds the scope of the release agreement called for in section 3.02 of the separation benefit plan. This is a further suggestion that the release agreement was intended to stand apart from the separation benefit plan. To elaborate: Section 3.02 merely requires the employee to release "all claims against Pharmacia, its affiliates and all related parties arising out of the Employee's employment or termination of employment." But the release agreement does much more; by signing it, plaintiffs agreed to (1) refrain from filing any lawsuit against Pfizer, (2) accept that the release agreement "extends to any claims that [they] may

have with respect to any separation plans or programs that have been offered by the Company in the past," (3) keep the release agreement confidential, (4) refrain from using or communicating any trade secrets or confidential information, (5) cooperate in any litigation involving them as Pfizer employees, (6) return all company property and (7) refrain from seeking employment with Pfizer for a period of time up to two years. It is thus not unreasonable that a release agreement more expansive than the one called for in the separation benefit plan would offer monetary consideration greater than that required by the separation benefit plan. Relatedly, it is at least plausible to read the release agreement as a free-standing contract outside the scope of the ERISA-covered separation benefit plan. (But if, on remand to state court, the facts and the law do not bear out this reading, plaintiffs' state law claims predicated on this "freestanding contract" theory will fail.)

Of course, escaping complete preemption comes with a price: Plaintiffs cannot outside the federal forum argue for relief under ERISA, for that cause of action is within exclusive federal jurisdiction. Plaintiffs might have, for example, argued in the alternative that the release agreement effected a constructive amendment to the separation benefit plan (which the court does not understand them to argue). The latter theory would be a claim for recovery of benefits due, under 29 USC § 1132(a), and could only be heard in federal court.

In fact, the *Eide* court recognized the possibility of just such a plan-amendment theory, but noted that it was not viable because the employees were not covered by their former employer's plan at the time they were terminated. *Eide*, 329 F.3d at 607. Even though *Eide* is distinguishable from this case on the ground that plaintiffs here *were* covered by an ERISA plan at the time of their termination, the court is confident that plaintiffs disclaim any reliance on an ERISA-based theory of recovery. The court stresses, though, that disclaiming reliance on an ERISA cause of action also means foregoing any support the ERISA plan documents may give plaintiffs. If this case is, as plaintiffs steadfastly maintain, only about the release agreement as a free-standing contract, then the separation benefit plan documents have little or no relevance.

In sum, subject to the plaintiffs' pleadings and representations in their moving papers, the court concludes that plaintiffs' causes of action predicated on the release agreement are not subject to complete preemption under ERISA and were therefore not properly removed pursuant to 29 USC § 1132(e).

### C

The court next turns to the incentive payments. The arguments on both sides are much the same as they were with respect to the severance payments, and the court will not belabor the issues. The transitional AIP incorporates by reference the separation benefit plan's definition of "termination due to change in control." As this provision was the basis for the court's conclusion that the separation benefit plan was covered by ERISA, the court concludes that the transitional AIP is also covered by ERISA, at least insofar as it concerns terminated employees.

■ But the court again finds that plaintiffs' claim, as pled and as argued in their papers, does not "relate to" this transitional AIP. Though the argument is slightly different from their argument with respect to the severance payments, plaintiffs do again trace their entitlement to a different source, to wit, "agreements made separate and apart from the [separation

benefit plan] for a specific bonus based on the employee's actual achievement rate. * * * [T]hese one-time agreements did not require any discretionary decisions or on-going administration." Pls. Opp. Mot. Dismiss (Doc. # 20) at 11:8–10. These "agreements made separate and apart" are, according to plaintiffs' complaint, founded on "defendants repeatedly offer[ing], orally and in writing (in the personalized statements), to pay each plaintiff class member a bonus in 2003 based upon each employee's actual achievement rate for calendar year 2002." Compl. (Doc. # 1 Ex. A) ¶ 61.

The court has already analogized the severance payment issue to the situation in *Eide*. The incentive payment issue as plaintiffs frame it is perhaps an even closer parallel to *Eide*. While plaintiffs trace their entitlement to severance payments to a freestanding contract that barely mentions an existing ERISA plan, the promises made to the *Eide* plaintiffs incorporated the financial computations of an existing ERISA plan by reference—in essence, the *Eide* plaintiffs alleged that the *Eide* defendants promised "if you are terminated within a year after we sell your unit, we will pay you the same amount of money you would have been entitled to under your current ERISA-covered severance plan." That promise was held not to constitute an ERISA plan because it involved only the one-time payment of a sum certain upon definite conditions. This is very close to what plaintiffs here allege concerning incentive payments: "The bonuses were one-time, lump sum amounts, and therefore do not meet the standards for an ERISA plan as set forth by the Ninth Circuit." Pls. Reply Mot. Remand (Doc. # 27) at 8:18–20 (citing *Delaye* and *Velarde*). That the amounts were computable by reference to the financial mechanics of the transitional AIP is of no moment, plaintiffs contend, because those provisions do not require the sort of ongo-ing administrative scheme that triggers ERISA's coverage.

Plaintiffs' position is clear enough: Defendants made oral representations, confirmed by the personalized statements, that they would give plaintiffs pro-rated incentive payments computed under the mechanics of the transitional AIP, with the modification that actual 2002 incentive rates would be used instead of target incentive rates.

■ As with the severance payments, however, plaintiffs must eschew reliance on an ERISA-based claim, such as a constructive amendment theory, to avoid federal jurisdiction. On this score, plaintiffs are somewhat equivocal. For example, in their opposition to defendants' motion to dismiss, plaintiffs state:

[The transitional AIP] contemplates that agreements may exist outside of the [transitional] AIP. * * * [T]he [transitional] AIP specifies that "[a]ll award recommendations must be approved and *can be adjusted by the appropriate levels of management.*" Thus, the exact scenario that plaintiffs alleged here, i e, that defendants, including top management officials, made oral representations that plaintiffs would receive bonuses calculated using an adjusted, higher rate than what is contemplated in the AIP, is sanctioned by the text of the AIP itself.

Pls. Opp. Mot. Dismiss (Doc. # 20) at 11:12–20 (emphasis and fifth alteration in original, citations and some internal quotation marks omitted). Similarly, at oral argument plaintiffs rested on their argument that the transitional AIP is not an ERISA plan. This suggests that plaintiffs might contemplate a constructive amendment theory—that the plan expressly permitted certain modifications of its parameters, and plaintiffs now seek to recover based on those modifications.

But if the case is remanded, plaintiffs cannot proceed on this theory. The court has held that the transitional AIP is an ERISA plan. Thus, under the constructive amendment theory suggested above, plaintiffs would be pursuing a 29 USC § 1132(a) claim for benefits due under an ERISA plan. This they cannot do in state court. Upon remand to state court, plaintiffs may *only* proceed on their *Eide* "freestanding contract incorporating certain plan provisions" theory. Because the constructive amendment theory above explicitly appears only in plaintiffs' opposition to defendants' motion to dismiss, and does not appear in their motion to remand, the court concludes that plaintiffs intend to proceed on that theory only if their motion to remand is denied. If plaintiffs file in state court a paper asserting a constructive amendment theory, removal would be proper. See 28 USC § 1446(b) (second paragraph).

"The plaintiff [is] the master of the claim; he or she may avoid federal jurisdiction by exclusive reliance on state law." *Caterpillar Inc. v. Williams,* 482 U.S. 386, 392, 107 S.Ct. 2425, 96 L.Ed.2d 318 (1987). Plaintiffs seek to proceed on fewer than all possible theories of recovery, and such is their choice. The court takes them at their word on the theories they will pursue in state court upon remand.

### D

The court is mindful that the result here may at first glance appear unjustly to reward artful pleading. On reflection, and setting aside whether plaintiff's allegations are accurate or provable, the court believes that plaintiffs' approach, is not too clever by half: As between allowing employers, on the one hand, to make promises to employees that overlap with but stand outside existing ERISA-covered benefit plans, but later repudiate those promises under the mantle of ERISA preemption, and allowing employees, on the other hand, to seek the benefit of the bargains they accepted, the court thinks the latter is more in keeping with ERISA's remedial nature. See *Associated General Contractors v. Smith,* 74 F.3d 926, 929 (9th Cir.1996) ("ERISA is a comprehensive remedial statute intended to protect the interest of employees in pension and welfare plans." (citing *Hydrostorage, Inc. v. Northern Cal. Boilermakers,* 891 F.2d 719, 726 (9th Cir.1989))). Policing the boundaries of ERISA under these circumstances is a task left to state courts, but there is no reason to believe they cannot do so.

### III

Having concluded that this court does not have jurisdiction under 29 USC § 1132(e), the court turns to the other source of subject matter jurisdiction advanced by defendants, 28 USC § 1332, diversity jurisdiction. Section 1332 requires complete diversity, i e, that no plaintiff be a citizen of the same state as any defendant. *Strawbridge v. Curtiss,* 7 U.S. (3 Cranch) 267, 2 L.Ed. 435 (1806). Plaintiffs are both citizens of California. Defendant Sugen was, at the time of the events in question, clearly a citizen of California, as it was a corporation with its principal (and only) place of business in California. See 28 USC § 1332(c)(1); Oliveira Decl. (Doc. # 15) ¶ 3. The question is whether Sugen, now no longer active as it has ceased operations, is still a citizen of California, and thus nondiverse from plaintiffs.

There is a three-way split on the proper test for the citizenship of a defunct or inactive corporation. See William W. Schwarzer, A. Wallace Tashima, James M. Wagstaffe, *Federal Civil Procedure Before Trial* ¶ 2:321.4 (Rutter, 2004).

Some courts look to both to the state of incorporation and to the state of the corporation's last business activity. * * * Some courts hold an inactive cor-

poration has no "place of business" and therefore is a citizen only of its state of incorporation. * * * Other courts adopt a case-by-case approach: i e, if the corporation has been inactive for a substantial period of time (e g, 5 years), it is a citizen only of the state where it is incorporated. Otherwise, the court must examine the company's activities as it was closing its doors and determine whether its business had a continuing impact in that locale. If so, the place of its last business activity would be relevant to (but not dispositive of) the determination of its "principal place of business."

*Id.* ¶ 2:321.5–.7.

Although other circuits have weighed in on this question, there appears to be no controlling Ninth Circuit precedent. Defendants appeal to *Stock West Corp. v. Taylor,* 964 F.2d 912 (9th Cir.1992), which held that an Oregon corporation that had ceased activity within Washington state over three years before filing suit was a citizen only of Oregon for diversity purposes. Defendants contend that, of the options outlined above, the Ninth Circuit obviously did not adopt the "last business activity" test. Further, defendants argue, the Ninth Circuit could not have adopted the flexible "substantial period of time" test, because *Stock West* contains none of the factual analysis that that test requires. Ergo, defendants conclude, the Ninth Circuit must have employed the "no place of business" rule.

The court disagrees. The flaw in defendants' argument is that *Stock West* does not explicitly announce a legal rule and its outcome is equally consistent with the "substantial period of time" test and the "no place of business" rule. Three-plus years of total inactivity satisfies the "substantial period of time" test, so the case simply did not require the court of appeals to decide between the "substantial period

of time" test and the "no place of business" rule. (That said, *Stock West* surely signals the Ninth Circuit's rejection of the "last business activity" test, but that is of no aid to defendants.) Accordingly, because there is no controlling precedent, it is for this court to decide which test to apply.

■ The "inactive corporations have no place of business" rule has the advantage of clarity, but the disadvantage of expanding the scope of diversity jurisdiction. Thus this interpretation runs afoul of the principle that statutes conferring jurisdiction are to be construed narrowly. See, e.g., *Healy v. Ratta,* 292 U.S. 263, 270, 54 S.Ct. 700, 78 L.Ed. 1248 (1934). The "last business activity" test avoids this problem, but only by going to the opposite extreme. The resulting formalism means that a corporation that long ago ceased operations would arbitrarily be designated a citizen of a state to which it has for many years had no connection. Accordingly, the third option—a flexible and functional approach—strikes a reasonable middle ground, if at the expense of definiteness.

■ The undersigned is not the first judge of this court to address the question. In recent years, Judges Alsup and Patel have offered the most detailed discussions from this court. See *Homestake Lead Co. v. Doe Run Resources Corp.,* 282 F Supp 2d 1131, 1136–38 (N.D.Cal.2003) (Patel, CJ); *Sellers v. Kohlberg & Co., LLC,* 2001 WL 761187 (N.D.Cal.2001) (Alsup, J). Both concluded that "the functional approach of the Fourth and Fifth Circuits best equips the court to carry out the intent of Congress." *Homestake Lead,* 282 F Supp 2d at 1137. The court agrees with the analysis in those opinions. Defendants concede that the district courts of the Ninth Circuit favor this test. Def. Opp. Mot. Remand (Doc. # 21) at 18–22.

The analysis is straightforward: Sugen was operating in California at least until late 2003, when the last of its employees were terminated. Oliveira Decl. (Doc. # 15) ¶ 4. The instant suit was filed in state court half a year later, on June 15, 2004; it was removed to this court one month later; and these motions come before the court roughly a year after Sugen ceased operations in California. No case of which the court is aware has held that such a short interval between a business' shutdown and the pendency of a lawsuit amounts to a "substantial period of time." The Fourth and Fifth Circuit cases enunciating the "substantial period of time" test turned on three-year and five-year periods of inactivity, respectively. See *Athena Automotive, Inc. v. DiGregorio*, 166 F.3d 288, 292 (4th Cir.1999); *Harris v. Black Clawson Co.*, 961 F.2d 547, 551 (5th Cir. 1992). Unsurprisingly, defendants do not even attempt to argue that a matter of months is a "substantial period of time." Nor is there serious dispute that Sugen's actions have had a continuing effect in the locale.

Instead, defendants appeal to the policy underlying 28 USC § 1332 of giving out-of-state litigants a haven from local prejudice in state courts, noting that in state court there may be "ill will toward three out-of-state corporations, only one of which ever had a presence in California—a presence that ended over a year ago under circumstances requiring the termination of hundreds of employees." Def. Opp. Mot. Remand (Doc. # 21) at 21:3–5. But of course, the source of the ill will (if any) would flow from the layoffs, not the defendants' out-of-state character. And ill will because of a defendant's conduct is not the sort of prejudice that the diversity jurisdiction statute was designed to combat.

Accordingly, the court concludes that defendant Sugen is a citizen of California for purposes of 28 USC § 1332. The parties are nondiverse, and therefore removal cannot be founded on diversity jurisdiction.

## IV

In sum, the court has concluded that there is no basis for federal jurisdiction in this case. Accordingly, plaintiffs' motion to remand (Doc. # 12) is GRANTED. Defendants' motion to dismiss (Doc. # 8) is TERMINATED as moot. The clerk is directed administratively to close the file and terminate all motions.

IT IS SO ORDERED.